# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
HYUNDAI ROTEM COMPANY,                            )
                                                  )
    Plaintiff,                )
                                                  )
    v.                         )
                                                  )
MASSACHUSETTS BAY TRANSPORTATION   )
AUTHORITY; MASSACHUSETTS                          )
DEPARTMENT OF TRANSPORTATION;                     )
JOHN R. JENKINS, in his capacity as a member      )
of the Board of Directors of the Massachusetts    )
Department of Transportation; RICHARD             )
DAVEY, in his capacity as a former member of      )
The Board of Directors of the Massachusetts       )
Department of Transportation and former           )
Secretary of Transportation of the Commonwealth   )
of Massachusetts; JOSEPH C. BONFIGLIO, in         )
his capacity as a member of the Board of Directors )  Civil Action No.:
of the Massachusetts Department of                )
Transportation; DOMINIC BLUE, in his capacity     )
as a member of the Board of Directors of the      )
Massachusetts Department of Transportation;       )
ALAN MACDONALD, in his capacity as a              )
former member of the Board of Directors of the    )
Massachusetts Department of Transportation;       )
JANICE LOUX, in her capacity as a member of       )
the Board of Directors of the Massachusetts       )
Department of Transportation; ANDREW              )
WHITTLE, in his capacity as a member of the       )
Board of Directors of the Massachusetts           )
Department of Transportation; ROBIN CHASE,        )
in her capacity as a member of the Board of       )
Directors of the Massachusetts Department of      )
Transportation; THE EXECUTIVE OFFICE OF           )
THE GOVERNOR OF THE COMMONWEALTH )
OF MASSACHUSETTS; DEVAL L. PATRICK,               )
in his capacity as the former Governor of the     )
Commonwealth of Massachusetts, and                )
CNR MA CORPORATION,                               )
                                                  )
    Defendants.                )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Hyundai Rotem Company ("HRC"), by its attorneys, Pierce Atwood LLP, as and for its complaint against the defendants named herein, alleges as follows:

1. This action arises from a flawed and unlawful procurement process in which defendant Massachusetts Bay Transportation Authority ("MBTA") recommended, and the Massachusetts Department of Transportation ("MassDOT") Board of Directors (the "MassDOT Board") authorized the General Manager and Rail and Transit Administrator to enter into, a contract (the "Contract") with defendant CNR MA Corporation ("CNR") for the manufacture and delivery of up to 284 new Red and Orange Line Vehicles for a total "not-to-exceed delivered cost of $566.6 million."  On January 14, 2014, HRC was informed that the MBTA had issued a Notice to Proceed ("NTP") to CNR in respect of the Contract notwithstanding the pendency of an administrative appeal in which HRC and others have protested the award of the Contract to CNR.

2. The procurement process was deeply and fundamentally flawed because the MBTA failed to put the bidders on equal footing, made arbitrary and capricious decisions, failed to adhere to the terms of the bid documents or do minimum due diligence of CNR, all in violation of Mass. Gen. Laws c. 30, § 39M (the "Bidding Law") and applicable precedents.  The MBTA was also influenced by improper communications which CNR's Chinese joint venture partners had with defendant former Governor Deval Patrick ("Patrick") and defendant former Massachusetts Secretary of Transportation and MassDOT Board Member Richard Davey ("Davey"), and perhaps others, and accepted CNR's widely publicized, but improper, contingent offer to set up its North American headquarters in Massachusetts and to invest an additional $60 million not required by the Contract to sweeten CNR's bid.  In actual fact, HRC was the lowest

responsible and eligible bidder within the meaning of the Bidding Law and, therefore, as a matter of law it is entitled to the award of the Contract.

3.  HRC has filed an administrative appeal with the MBTA, and that appeal is pending. In the meantime, the MBTA, MassDOT, Patrick and the Office of the Governor have failed to timely produce documents pursuant to HRC's public records requests pursuant to Mass. Gen. Laws. c. 66, § 10 (the "Public Records Law") and refused to provide HRC with assurances that it would not proceed with issuing a NTP to CNR to or enter into a contract with CNR until a reasonable time after the determination of the administrative appeal.

4.  For reasons set forth in greater detail below, HRC seeks appropriate declaratory relief and:  (1) a temporary restraining order and preliminary injunction requiring the MBTA, MassDOT, Patrick and the Office of the Governor to discharge their obligations under the Public Records Law; (2) a temporary restraining order and preliminary injunction enjoining the MBTA from proceeding with the award to or contracting with CNR; (3) a prompt hearing on the merits of HRC's claims; and (4) after hearing, a permanent injunction requiring the MBTA and the MassDOT Board to award the Contract to HRC as the lowest responsible and eligible bidder pursuant to the Bidding Law and a declaratory judgment disqualifying CNR as an eligible bidder to this procurement.

**Parties**

5.  Plaintiff, HRC, is a foreign corporation incorporated in the Republic of Korea with a principal place of business in Seoul, Korea.  HRC's Railway Division supplies various types of railway vehicles, including EMU's, high speed trains, LRV's, DMU's, locomotives, and passenger coaches and freight trains, to more than 30 countries across the world.  HRC has localized the core electrical equipment of railway vehicles and produces various electrical

systems, including total train control systems, traction motors, propulsion control systems, and auxiliary power units.  HRC has also expanded its business to incorporate railway systems, including signals, communications, electricity, PSD and car maintenance.

6.  Defendant MBTA is a political sub-division of the Commonwealth of Massachusetts with a principal place of business located at 10 Park Plaza, Suite 3910, Boston, Massachusetts. According to its website, the MBTA is the nation's fifth largest mass transit system serving a population of over 4.8 million (2010 census) people in 176 cities and towns with an area of over 3,200 square miles.  The MBTA is the public operator of most bus, subway, commuter rail and ferry routes in the greater Boston, Massachusetts, area.

7.  Defendant MassDOT is an agency or department of the Commonwealth of Massachusetts with a principal place of business located at 10 Park Plaza, Suite 4160, Boston, Massachusetts.  MassDOT manages the MBTA.

8.  Defendant John R. Jenkins ("Jenkins") is a resident of the Commonwealth of Massachusetts and a member of the Board of Directors of MassDOT.

9.  Defendant Richard Davey ("Davey") is a resident of the Commonwealth of Massachusetts and a former member of the Board of Directors of MassDOT and former Secretary of Transportation of the Commonwealth of Massachusetts.

10.  Defendant Joseph C. Bonfiglio ("Bonfiglio") is a resident of the Commonwealth of Massachusetts and a member of the Board of Directors of MassDOT.

11.  Defendant Dominic Blue ("Blue") is a resident of the Commonwealth of Massachusetts and a member of the Board of Directors of MassDOT.

12.  Defendant Alan Macdonald ("Macdonald") is a resident of the Commonwealth of Massachusetts and a former member of the Board of Directors of MassDOT.

{W4614863.4}

4

13.  Defendant Janice Loux ("Loux") is a resident of the Commonwealth of Massachusetts and a member of the Board of Directors of MassDOT.

14.  Defendant Andrew Whittle ("Whittle") is a resident of the Commonwealth of Massachusetts and a member of the Board of Directors of MassDOT.

15.  Defendant Robin Chase ("Chase") is a resident of the Commonwealth of Massachusetts and a member of the Board of Directors of the MassDOT.  Defendants Jenkins, Davey, Bonfiglio, Blue, Macdonald, Loux, Whittle and Chase are sometimes referred to collectively as the "MassDOT Board".

16.  Defendant the Executive Office of the Governor of the Commonwealth of Massachusetts is a department that provides services to and on behalf of the Governor of the Commonwealth.

17.  Defendant Patrick is a resident of the Commonwealth of Massachusetts and was the Governor of the Commonwealth of Massachusetts from January 4, 2007 until January 7, 2015.

18.  Defendant CNR is a Massachusetts corporation with a principal office located at 111 Huntington Avenue, Boston, Massachusetts.  For the purposes of 28 U.S.C. § 1332, CNR is a citizen of the Commonwealth of Massachusetts.  Upon information and belief, CNR is a joint venture of China CNR Corporation Limited ("China CNR") and CNR Changchun Railway Vehicles Co., Inc. ("CNR Changchun"), both companies doing business in and controlled by the government of the People's Republic of China.

## Jurisdiction and Venue

19.  The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because this action is brought by HRC, a foreign citizen, against defendants who are all

citizens of the Commonwealth of Massachusetts and the amount in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand Dollars ($75,000).

20.   Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because all defendants reside in Massachusetts and a substantial part of the events giving rise to HRC's claims occurred in Massachusetts.

### Statement of Facts

21.   On October 22, 2013 the MBTA issued a Request for Proposals (the "<u>RFP</u>") for the manufacture of new vehicles for the Orange and Red mass transit lines.   The RFP invited bids on a base contract for 152 new Orange Line cars configured in married pairs, 74 new Red Line cars configured in married pairs, Capital Spare Parts, Manuals, Diagnostic Test Equipment and Training Aids.   The RFP also included options for the MBTA to purchase 58 additional Red Line cars and various ancillary equipment.

22.   The MBTA's procurement was stated to be competitively negotiated through a two-phase "best value" selection method.   Under that method the MBTA was first to evaluate each Technical Proposal received in response to the RFP according to specific evaluation criteria before turning to Price Proposals.   Only after reviewing each Technical Proposal was the MBTA to unseal and review Price Proposals, ostensibly to protect the evaluation process from any improper pressure or appearance of impropriety arising from the submission of an attractively low bid.   Only those bids deemed "eligible" on their technical merit were to be evaluated for price reasonableness and realism.

23.   The RFP established clear communication rules and designated Mr. Daniel G. Smith and Mr. Christopher Carven, both employees of the MBTA, as the sole points of contact for bidders during the proposal process.   The RFP expressly warned that communications regarding

{W4614863.4}

this procurement with any other officers of MassDOT, the MBTA or other third parties, including outside consultants, were prohibited and may result in disqualification of the offending bidder.

24.  The RFP's prohibition on communications with officers of the MassDOT, the MBTA or third parties, had it been enforced by the MBTA, was consistent with both the letter of and the policies behind the Bidding Law to create an open and honest competition with all bidders on equal footing, prevent favoritism and maintain a level playing field for all bidders.

25.  The RFP also provided that any Requests for Clarification from bidders were to be sent to Mr. Smith or Mr. Carven until the May 15, 2014 bid due date.

26.  The RFP set forth five (5) technical evaluation criteria, of which three (3) were stated to be of prime and equal importance.  These included Technical Approach, Manufacturing Plan and Past Performance.  The two (2) lesser criteria were Quality Assurance and Participation of Minority and Women Owned Business Enterprise ("MWBE").

27.  The Technical Approach criteria required bidders, among other things, to have familiarity and experience with unique North American transit vehicle design and manufacturing standards, including the American Society of Mechanical Engineers Safety Standard for Structural Requirements for Heavy Rail Vehicles ("ASME RT-2-2008") and the standards of the American Welding Society ("AWS").  Both ASME RT-2-2008 and the AWS standards bear directly on the safety and reliability of railroad vehicles.  The Technical Approach also required a bidder's proposed sub-supplier to have familiarity and experience with the unique requirements of the North American transit market.

28.  The Manufacturing Plan criteria required bidders to demonstrate, among other things, a sufficient manufacturing capacity for the contract and a logistics plan for the

manufacture of the vehicles, and specifically the coordination of final assembly of the vehicles in Massachusetts.

29.   The Past Performance criteria required bidders to identify their past performance in previous vehicle procurement and, pursuant to the RFP's express language, past performance on similar size and scope projects in the North American Market was to "weigh heavily in the evaluation."

### CNR's Joint Venturers' Campaign to Change the RFP and Their Improper Communications With Officials of the Commonwealth, Including the Governor

30.   The RFP required any and all bidders to demonstrate familiarity and experience with North American safety and engineering standards, to identify the North American experience of its sub-suppliers, and to demonstrate past performance in similar rail procurement projects.   The RFP also required the MBTA to weigh relevant past performance in North America heavily in its evaluation of a bidder.

31.   Neither CNR nor either of its Chinese joint venture partners has ever manufactured or delivered rail cars to the North American market, and hence could not in any sense meet the requirements of the RFP.  Consequently, CNR's Chinese joint venturers wasted no time in mounting a campaign to change the RFP's requirements so as to make the to-be-incorporated CNR an acceptable bidder, which neither it nor its joint venture partners were.

32.   On November 11, 2013, Sojitz Corporation of America ("Sojitz") made its first Request for Clarification ("RFC") of the RFP.  Although styled as a request for "clarification," in substance Sojitz sought a material amendment to the RFP so as to remove from it any language relating to the North American market, specifically the phrases "Past Performance on similar size and scope projects in the North American Market will weigh heavily in the evaluation" and "List North American projects first" from the Past Performance criteria in the RFP.  Upon information

and belief, Sojitz, which maintains offices in New York, New York, was acting as agent for one or both of the China CNR and/or CNR Changchun, the joint venture partners of to-be-incorporated CNR, but Sojitz did not disclose the identity of its principals, who remained concealed until CNR submitted its price proposal to the MBTA on or about May 15, 2014.

33.  As part of the same RFC, Sojitz, on behalf of CNR's Chinese joint venturers, also sought removal of North American language in the Technical Approach criteria of the RFP, specifically the phrase "with an emphasis on North American projects" and also asked the MBTA whether European welding standard EN15085 would be acceptable rather than the American welding standards required by the RFP.

34.  As a part of the campaign by CNR's Chinese joint venturers to strip from the RFP references to North American experience and manufacturing know-how, these joint venturers blatantly violated the RFP's prohibition on "communications regarding this procurement [between bidders and] any other officers of the Massachusetts Department of Transportation, the MBTA or other third parties."  Specifically, on or about December 13, 2013, representatives of one or both of CNR's Chinese joint venturers met privately with Patrick, Davey and other representatives of MassDOT in Hong Kong (the "Hong Kong Meeting").

35.  During this "trade mission" to Hong Kong, Patrick and Davey engaged in private ex parte discussions with officials of one or both of CNR's Chinese joint venturers regarding CNR's intention to construct a facility in Massachusetts should it be awarded the Contract.

36.  As of December 2013, neither of CNR's Chinese joint venturers had any Massachusetts business to discuss with the then Chief Executive of the Commonwealth and his Secretary of Transportation other than the pending RFP.  Despite Patrick's and Davey's denials,

it defies all logic to believe that the RFP was not discussed at this meeting as CNR's joint venturers had no other business interests in Massachusetts and no history of any dealings here.

37.   CNR's  joint venturers' private communications with Patrick, Davey and others from MassDOT were wholly improper and the clear effect of those communications was to put to-be-incorporated CNR on unequal footing vis-à-vis other bidders, including HRC, who had no visits with the Chief Executive of the Commonwealth or representatives of MassDOT during the proposal process.  Notably, although Patrick, Davey and others were on a multi-country Asian trade mission, no effort was made to have a similar meeting with any other bidder, including HRC, which maintains its headquarters in Seoul, Korea, and also has a substantial railcar manufacturing facility in Philadelphia, Pennsylvania.

38.   As no other bidders were afforded the same "inside track" as CNR's joint venturers, those ex parte communications were also in direct contravention of Section A1.01B of the RFP and the MBTA displayed impermissible favoritism in violation of the Bidding Law by not disqualifying CNR as a bidder.

39.   Moreover, CNR's joint venturers' improper communications with Patrick and Davey and others in Hong Kong, and perhaps elsewhere, tainted the integrity of the entire procurement process. At minimum, they create the appearance of impropriety, and most likely actual impropriety, particularly in light of the MBTA's subsequent relaxation of the rules set forth in the RFP in favor of CNR and the MBTA's subsequent recommendation to the MassDOT Board to award the Contract to CNR.

40.   CNR's joint venturers' flagrant violation of the RFP and the Bidding Law, for which CNR is now legally responsible, should have resulted in CNR's disqualification as a bidder and now mandates withdrawal of the award of the Contract to CNR.

41.  On January 27, 2014, in another RFC submitted by Sojitz on behalf of CNR's joint

venturers (but, again, without disclosing the identities of Sojitz' principals), Sojitz  asked the

MBTA to remove the requirement that any bidder set forth in its proposal the North American

manufacturing experience of its suppliers.

42.  On February 28, 2014, Sojitz, on behalf of CNR's Chinese joint venturers, *again*

sought removal of the "in North America" phrase in the Past Performance criteria. Sojitz, on

behalf of CNR's Chinese joint venturers, also asked the MBTA to clarify how "heavily" the

North American past performance would weigh in the MBTA's evaluation of proposals.

43.  Also on February 28, 2014, Sojitz, on behalf of CNR's joint venturers, *again* sought

removal of the requirement in the Technical Proposal criteria for a bidder to indicate its

"experience with the design and manufacture of similar car bodies with an emphasis of North

American projects" and the reference in the RFP that the MBTA "places a special emphasis on

the use of equipment that is service proven in a similar application in the North American

market."  Sojitz, on behalf of CNR's Chinese joint venturers, also asked the MBTA to clarify

how the North American "emphasis" would affect the MBTA's evaluation.

**MBTA Acquiesces to CNR's Joint Venturers' Campaign
to Strip North American Requirements from the RFP**

44.  On March 4, 2014, the second business day after the second RFC which Sojitz

submitted on behalf of CNR's Chinese joint venturers on February 28, 2014 to strip the RFP of

its North American requirements, the MBTA tamely acquiesced by substantially relaxing the

RFP requirements to the sole benefit of the to-be-incorporated CNR.  In doing so, the MBTA

displayed impermissible and unlawful favoritism towards the to-be-incorporated CNR.

45.  Specifically, in Addendum No. 7 to the RFP, which the MBTA issued on March 4,

2014, the MBTA made two key changes to the RFP.  First, the MBTA changed the ratings

method from a numerical 100-point ratings method to an ambiguous and murky

"qualitative/descriptive method".  The net result of the change to the ratings method is the

MBTA's ability to obfuscate the relative differences between the MBTA's evaluation of each

bidder and to eliminate any pretense of transparency in the MBTA's evaluation of each of the

RFP's technical factors.

46.  The second key change to the RFP contained in Addendum No. 7 was to relax the

Past Performance criteria's requirement that "[p]ast performance on similar size and scope

projects in the North American Market will weigh heavily the evaluation."  Specifically, the

MBTA effectively gutted the Past Performance requirement by adding the following sentence:

> Although experience on projects in North America is most directly
> relevant, the MBTA recognizes that past performance on projects
> of similar size and scope outside of North America is also relevant.

47.  For the first time, Addendum No. 7 made explicit that past performance on projects

outside of North America would be given weight by the MBTA notwithstanding the substantial

differences between the very unique North American technical and other requirements from

those in other regions of the world and which bear directly upon operational reliability and

passenger safety.

48.  Upon information and belief, the new language in Addendum No. 7 objectively

favored and was expressly intended to favor the to-be-incorporated CNR.  However, it

irreversibly impugned the integrity of the procurement process itself and contributed to creating

an impermissible "un-level" playing field for the rest of the bidders in violation of the Bidding

Law.

49.  With the substantial changes to the RFP brought about by Addendum No. 7, CNR's

Chinese joint venturers, for the first time, were in a position potentially to qualify as a bidder for

the new Red and Orange Line vehicles.  Accordingly, approximately two (2) weeks later, on or

about March 17, 2014, those joint venturers caused CNR to be incorporated in Massachusetts.

According to filings with the Massachusetts Secretary of State, all of the named directors and

officers of CNR, including its President, Xiwei Lu, are residents of the People's Republic of

China.

### The MBTA's Arbitrary and Capricious Evaluation of Proposals

50.  On or about May 15, 2014, the MBTA received six (6) proposals in response to the

RFP, including submissions from HRC, CNR, Kawasaki Rail Car, Inc. ("Kawasaki"),

Bombardier Transit Corporation ("Bombardier"), Construcciones y Auxilar de Ferrocarriles

("CAF"), and CSR Qingdao Sifang ("CSR").  Upon information and belief, CSR, like CNR's

joint venturers, is based in and controlled by the government of the People's Republic of China.

Each proposal consisted of two parts:  a Price Proposal (PART A) and a Technical Proposal

(PART B).  Pursuant to the RFP, the Price Proposals were to remain sealed until after the MBTA

completed its evaluation of each Bidder's Technical Proposal.

51.  Upon information and belief, the MBTA's evaluation of Technical Proposals

occurred from May through July 2014.

52.  CAF's Technical Proposal was deemed non-responsive because CAF indicated that it

would not comply with the performance guarantee requirement (Letter of Credit) for the

Contract.  As such CAF was removed from the evaluation process.

53.  After the Technical Evaluation, CSR was deemed by the MBTA to be

"Unacceptable" and did not proceed to the Price Proposal evaluation.

54.  More specifically, CSR received "Unacceptable" ratings for its Technical Approach,

Manufacturing Approach, and Quality Assurance Plan.  In addition, the MBTA concluded that

CSR demonstrated a lack of understanding of North American car procurement standards and processes in many key areas such as design, project approach, car safety and systems integration.

55.   For reasons set forth in greater detail below, the MBTA's scoring of CNR's Technical Proposal was unreasonably high, arbitrary, capricious, and lacked any rational basis.

56.   Beginning with the March 4, 2014 changes to the RFP brought about by Addendum No. 7 and throughout the technical evaluation of price evaluation, CNR was given unfair breaks by the MBTA, which put CNR on unequal footing compared with the other bidders and violated the Bidding Law and its core purposes.  Moreover, CNR's Technical Proposal, on its face, demonstrates in multiple respects, including but not limited to the matters set forth herein, that CNR was not the "lowest responsible and eligible bidder," as required by the Bidding Law.

## North American Rail Design and Welding Standards

57.   The MBTA awarded CNR a rating of "Acceptable" for the Technical Approach criterion despite CNR's abject lack of familiarity and experience with the design and manufacture of stainless steel car bodies pursuant to American standards.

58.   Specifically, CNR's proposal was silent as to CNR's experience with ASME RT-2 compliance and American welding standards, which were explicitly required by the RFP.

59.   ASME RT-2 is a safety standard applicable to heavy rail transit vehicles for passenger service.  It defines the requirements for the incorporation of passive safety design concepts related to the performance of the vehicle carbody in collisions, so as to enhance passenger safety while limiting and controlling damage.  This standard is the first of its kind in North America and arose from an industry groundswell to address the heavier-duty carbody requirements of North America versus those of Europe, which are governed by European standards.

60.   ASME RT-2 is unique for utilizing Crash Energy Management ("CEM") protocols, which enhance crashworthiness of a carbody designed under CEM protocols by assigning certain sections of the carbody the task of absorbing a portion of the energy in a collision by crushing in a controlled manner.   CEM protocols, incorporated in the ASME RT-2 safety standards, heighten passenger safety.

61.   The MBTA admitted in its evaluation that CNR did not demonstrate familiarity with the American safety standards when interviewed by the MBTA, thus raising serious questions, albeit overlooked or ignored by the MBTA, as to whether CNR or its joint venturers can deliver subway cars to Boston which are sufficiently reliable and safe for the MBTA and the ridership.

62.   CNR's proposal was also silent about CNR's experience with American welding standards, which were explicitly required by the RFP and which are also intended to assure safety, improve quality, and ensure compliance with welding certification guidelines.   In fact, CNR submitted an RFC to the MBTA on November 11, 2014 asking whether European welding standards would be considered.

63.   The MBTA made no amendment eliminating the requirement of AWS standards; however, CNR's proposal, on its face, does not demonstrate knowledge of or a commitment to adhere to those standards.

64.   Stainless steel railcar body construction is a very complex manufacturing process and American manufacturing standards are especially stringent and difficult to meet.   Unlike HRC, CNR has absolutely no experience meeting North American safety standards (ASME RT-2 and AWS standards) and CNR's proposal in no way demonstrated that CNR would be able to meet North American Safety standards on this project.   CNR's proposal failed to even reference them,

thus demonstrating either total ignorance of or complete indifference to the reliability of the vehicles and the safety of the Red and Orange Line ridership.

65.  Notwithstanding these glaring omissions in CNR's proposal, which it never supplemented, the MBTA inexplicably and irrationally awarded CNR the same "Acceptable" rating as HRC received despite HRC's familiarity with North American safety and welding standards.  However, the March 4, 2014 change in the ratings method contained in Addendum No. 7 to the RFP allowed the MBTA to obfuscate the relative differences in ratings between CNR and HRC and thus give unfair and unlawful preferential treatment to CNR.

### Manufacturing Capacity of CNR and Its Suppliers

66.  The MBTA awarded CNR with the highest rating of "Good" compared with all other bidders on the Manufacturing Plan criterion despite the fact that CNR has had absolutely no experience establishing a facility outside of China and failed to provide clear information about its manufacturing capacity for the Contract.

67.  CNR's proposal represented that no other rapid transit vehicles were scheduled to be manufactured at CNR's Changchun, China, factory during the period of the Contract.  That representation is not only inherently incredible and unworthy of belief given that CNR is the largest train manufacturer in the world, but also made impossible an evaluation by the MBTA of CNR's manufacturing capacity considering its other contracted work.

68.  CNR also failed to provide information about the manufacturing capacity of its sub-suppliers' ability to meet the production schedule for the Contract or any information about the North American experience of its sub-suppliers.  It was therefore impossible for the MBTA to verify that CNR's sub-suppliers had the requisite experience and capacity to meet the Contract production schedule.

69.  Pursuant to CNR's manufacturing plan, 15 of CNR's 20 subcontractors are located in the United States, but none of these 15 is involved in the most safety-critical rail car components: the car bodies, the third rail components and the trucks, *i.e.,* the critical undercarriage of the vehicles to which the wheels are connected.  CNR has stated that it intends to design and manufacture these components themselves in China, where it has no relevant experience.

70.  It is a clear abuse of discretion, and a manifestly arbitrary decision, for the MBTA to allow a bidder with no North American experience to design and manufacture the three most critical passenger rail car safety components without any meaningful assistance from subcontractors with the requisite North American experience.

**CNR's Lack of North American Past
Performance and Absence of Reliability Information**

71.  The MBTA awarded CNR an "Acceptable" rating for the Past Performance Technical criterion despite CNR having no past experience whatsoever in North America and despite the RFP's requirement that North American experience was to "weigh heavily" in the MBTA's evaluation.

72.  CNR also failed to provide required reliability information from its Chinese joint venturers' past projects.  Specifically, of the nine (9) comparable past projects that CNR submitted for consideration – none from North America – CNR failed to submit any formal letters of concurrence from its Chinese joint venturers' customers on those past projects.

73.  Submission of letters of concurrence was an express requirement of the RFP and such letters go directly to CNR's reliability.  Without them, the MBTA had no basis on which to verify CNR's reliability in past projects or CNR's credibility in describing its past performance.

74.   CNR's past project matrix also failed to include reliability information for specific subsystems of its past projects, including but not limited to cab equipment and lighting, all of which were required by the RFP.

75.   Pursuant to the RFP, all bidders were required to set forth performance data for each past project during a specific validation period.  Curiously, CNR's description of performance data is identical for each of the nine (9) projects for which it submitted data.

76.   This clear "cut-and-paste" job by CNR should have caused the MBTA concern because it is inherently unbelievable that the validation period for each of CNR's Chinese joint venturers' nine (9) past projects was exactly the same given that each project ostensibly had its own specific contractual conditions.

77.   Strikingly, of the subcontractors included in CNR's nine (9) prior comparable project matrix, none of them were also proposed for this contract.  The MBTA was rightly concerned about this disconnect and admitted that it "raises the concern of potential risk with regard to the potential working relationship with these subcontractors."  Nonetheless, it proceeded ahead to recommend CNR and its untested subcontractors.

78.   The RFP also required CNR to list all passenger transportation projects over the past ten (10) years.  CNR listed 23 passenger transportation projects, of which 18 were domestic projects in China and none were projects in North America.  For each of the 23 passenger transportation projects listed, CNR reported that delays and liquidated damages were "N/A" with no further explanation.

79.   The MBTA should have more closely scrutinized CNR's past performance list for accuracy because 23 projects for the largest rail manufacturer in the world is an unreasonably

low number of projects, which suggests CNR did not include every passenger transportation project.

80.  In fact, CNR's website (http://en.chinacnr.com) reveals at least 20 other projects completely missing from CNR's past performance list, including alleged projects in Turkmenistan, Iran, Sri Lanka, Ghana, Bangladesh, Pakistan, Nigeria and Ethiopia, all countries with minimal or non-existent technical safety and reliability standards.  Failure of CNR to disclose these projects gives rise to all manner of negative inferences but, at the very minimum, should have triggered scrutiny by the MBTA that was simply not forthcoming.

81.  CNR's claim of no delays on any project should also have raised the MBTA's suspicions as being "too good to be true" or lacking in requisite candor from CNR given that all other bidders admitted to schedule delays on prior projects, which are inherent in any complex technical undertaking.

82.  CNR's representation that delays and liquidated damages were "N/A" should have also been questioned by the MBTA because CNR reported matching actual delivery dates and contractual delivery dates for the majority of its 23 passenger transportation.

83.  The other Chinese bidder, CSR, alleged the same matching contractual and actual delivery schedules for its past performance matrix.  In the case of CSR, however, the MBTA criticized CSR's representation as raising "concerns as to the actual commercial terms of the contract delivery requirements."  Accordingly, the MBTA penalized CSR for the very same deficiency for which it rewarded CNR, a transparently arbitrary and capricious finding.

84.  The MBTA awarded CNR a *higher* rating than HRC for past performance despite HRC's multiple past projects in North America and with the MBTA specifically.  Once again,

the MBTA arbitrarily rewarded CNR for its inherently unbelievable representations concerning its past performance.

## The MBTA Allowed CNR to Compensate for Its Deficient Technical Rating

85.  Rather than give CNR the "Unacceptable" rating for past performance that it deserved, the MBTA negotiated unilaterally with CNR to allegedly "mitigate the risks" associated with CNR's lack of experience in North America.

86.  The centerpiece of the MBTA's "risk mitigation" plan is to increase CNR's performance guaranty Letter of Credit by $100 million, along with various other contractual modifications.

87.  CNR agreed to increase its Letter of Credit and to other modifications, but none of the other bidders were provided the opportunity to amend their proposals.

88.  Indeed, pursuant to RFP Section A1.13.B.1, the MBTA was permitted to award the Contract based solely on initial proposals and limited the MBTA's communication with bidders to requests for clarification.

89.  The MBTA impermissibly permitted just one bidder, *i.e.,* CNR, to make a substantive revision to its proposal while denying such an opportunity to the other bidders, including HRC, once again displaying an impermissible and arbitrary favoritism to CNR.

90.  Pursuant to the RFP, the MBTA obligated itself to rate CNR's technical proposal as "Acceptable" or not.  It clearly was not, as evidenced by the MBTA's own conclusion that there was a "risk" that needed to be "mitigated."  Accordingly, CNR should have been deemed ineligible, the MBTA should have removed it from the process, and its Price Proposal should have been discarded.

91.  By allowing CNR to compensate for its glaring technical deficiency in past performance, the MBTA abused its discretion and violated the Bidding Law requirement of a level playing field.

92.  Moreover, the provisions the MBTA negotiated do absolutely nothing to mitigate the risk of CNR's non-performance.  All the money in the world will not deliver specially manufactured rail cars built to exacting specifications over a period of nearly ten (10) years.

93.  If CNR defaults on the Contract, it will take years for another supplier to furnish these rail cars because they are unique goods.  The MBTA's remedy to mitigate the risk of CNR's non-performance is hollow, as the MBTA has made clear that there is a dire need to ensure that new Orange and Red Line cars are delivered on time.  By awarding the Contract to CNR, the MBTA and MassDOT are closing their collective eyes to the serious risk of nonperformance or substandard performance created by CNR's complete lack of North American experience.

### CNR's Wrongful Sweetening of the Deal with a Promise of a North American Headquarters

94.  Consistent with the governing Bidding Law, the RFP announced that this critical and long overdue public procurement would be awarded to the responsible bidder who possesses the management, financial and technical capabilities necessary to fulfill the contract requirements and who submits the technical and price proposals most advantageous to the MBTA.

95.  Not only did CNR fail to fully respond to these guidelines, and therefore to the Bidding Law, CNR also sweetened the deal by dangling before the then Governor, MassDOT and the MBTA a promise to establish its North American headquarters in Massachusetts, which would (allegedly) remain in Massachusetts long after the estimated 2024 completion date for this project.

{W4614863.4}

96.  Unfortunately, our former Governor, his Secretary of Transportation, MassDOT and the MBTA took the political bait.  In explaining "what this deal was about" at a press conference held by Patrick in Springfield, Massachusetts, and attended by Davey and MBTA General Manager Beverly Scott on October 21, 2014, the day <u>before</u> the MBTA made its recommendation to the MassDOT Board, Patrick announced that CNR's Springfield plant would be its North American headquarters and that CNR would seek contracts for work "all over the country."  Patrick explained to Springfield-area residents that jobs would remain beyond the 2024 completion date for the Contract.  Davey went on to explain that this deal was about getting people to work in Boston and putting people to work in Springfield.

97.  CNR's offer to locate its North American headquarters in Massachusetts was the centerpiece of its proposal, emphasizing the "huge commitment" it was making; if CNR was awarded the Contract, it would supposedly be linked to Massachusetts for many years to come, with the promise to use the facility on all future rolling stock projects in North America.

98.  CNR made a public commitment, as early as May 15, 2014, to invest $60 million of its own money in Massachusetts, with the promise of more to come.

99.  Even the Price Proposal Advisory Report from the MBTA acknowledged that CNR's strategy is to invest in rolling stock manufacturing for other North American rail procurements.

100.  CNR's strategy and public relations campaign have paid off, with the MBTA awarding it the Contract and emphasizing the North American headquarters and the $60 million investment in the MBTA PowerPoint Presentation made to MassDOT on October 22, 2014.

101.  The MBTA's acceptance of CNR's widely publicized contingent offer to invest $60 million outside the obligations required by the RFP is a textbook example of the misuse of public power for political gain.

102.  Of the four bidders, only CNR was new to the North American market and therefore susceptible to the suggestion that it locate a headquarters facility in Massachusetts, instead of a lesser, temporary facility, with the implicit *quid pro quo* being favorable treatment in the evaluation of proposals.  Alternatively, CNR may have offered the headquarters facility as a political inducement for the award.

103.  Either way, the RFP did not require the investment and a very revealing political spectacle unfolded with the announcement that the Contract had been awarded to the only bidder that offered the $60 million investment and an allegedly permanent Massachusetts presence.

104.  To the extent the MBTA awarded CNR the Contract based at all on the proposed North American headquarters and the separate investment, it was a further abuse of discretion and impermissible favoritism of the bidder that could offer the MBTA and other public officials the most political gain to the detriment of the other bidders, including HRC.  The arrangement also destroyed genuine and fair competition, and was subversive of the public interest.

**CNR's Price Proposal Is Unreasonable, Predatory and Dangerously Low**

105.  To assist in evaluating the price proposals, the MBTA commissioned consultants LTK Engineering Services to perform an Independent Cost Estimate ("ICE") based on publically available industry information.

106.  The ICE utilized three separate approaches, which were weighted and summed to develop a market-based Vehicle Upper Range and Lower Range estimate price.  The ICE Upper Range was $845.5 million and the Lower Range was $765.0 million. The MBTA chose to use the estimated Upper Range for comparative purposes in its analysis of each bidder's price proposal.

107.   The purpose of the Lower Range ICE is to test for low bids and the RFP included a procedure that the MBTA could have used to request CNR's certified cost and pricing data so that the MBTA could perform a detailed price reasonableness and realism analysis.

108.   CNR's Price Proposal of $566.6 million, including all options, was $279.9 million or 32.99% lower than the Upper Range of the ICE and $198.4 million or 25.9% lower than the Lower Range of the ICE.

109.   CNR's total price and its prices for the numerous individually priced items are dangerously below the Lower Range of the ICE.

110.   It was an abuse of discretion for the MBTA not to request CNR's certified cost and pricing data in light of its low bid.

111.   The MBTA Price Proposal Advisory Committee was concerned about CNR's low bid and concluded – based on mere assumption – that CNR had excluded design costs for the Red or Orange Line vehicles.  Even with that assumption, the MBTA conceded that CNR's proposal was estimated to be 13.9% lower than the historic 15-year average for heavy rail purchases.

112.   After CNR was awarded the Contract, CNR President Xiwei Lu was interviewed on October 22, 2014, and asked how CNR was able to underbid the other companies.  Mr. Lu stated that CNR planned to purchase their facility and amortize the costs over many years.  However, Mr. Lu's explanation did not support the Price Proposal Advisory Committee's assumption of design costs and simply does not bridge the $198.4 million gap between CNR's bid and the Lower Range ICE and defies elementary arithmetic.

113.   The CNR Price Proposal further illustrates CNR's inexperience in North American heavy rail vehicle procurement and evidences the inexorable conclusion that CNR's bid should have been rejected as unrealistically low.

114.   LTK's Estimate Price Proposal announces that the best starting point for reviewing a price proposal is to investigate down to the more detailed price items.

115.   CNR's price proposals for Capital Spare Parts, for example, are shockingly low and more than 50% lower than the associated ICE.  Low pricing for Capital Spare Parts impacts the base contract price as well as several options.

116.   It is clear from CNR's assertion of almost 100% Capital Spare Part interchangeability between Red and Orange line cars of different sizes and designs, and its complete and utter failure to set forth any extended pricing between the types of cars, that the proposed Capital Spare Part pricing from CNR is impractically low and consequently unreasonable and unrealistic.  Every other bidder provided different extended prices for Capital Spare Parts for the Orange Line and the Red Line vehicles.

117.   The drastic different between CNR's price and the next lowest bidder, HRC – who has built similar heavy rail vehicles in North America – should have raised serious concerns with the MBTA.

118.   CNR's price proposal not only violates the prohibition against unrealistically low estimates within Section A1.09B of the RFP, but it is also an example of selling below cost, which is *prima facia* evidence of an intent to injure competition in violation of the Massachusetts Unfair Trade Practices Act, *i.e.,* Mass. Gen. Laws c. 93A, §§ 2, 11.

119.   CNR knew that its Chinese joint venturers' abject lack of experience in the North American market combined with their lack of relationship with most of their proposed vendors,

and lack of reliability data, would be difficult, nay impossible, to overcome.  As a result, CNR priced its bid to win, regardless of actual costs, hoping that low price combined with the political advantages of locating their headquarters in Massachusetts would win the award.

120.  CNR's remarkably low price proposal was and should have been found to be unreasonable and predatory.

### CNR's Lack of Candor Regarding Its Merger with "Unacceptable" CSR

121.  On October 28, 2014, a mere week after the MassDOT Board voted to authorize the MBTA to enter into a contract with CNR, the Financial Times reported that CNR China, one of the joint venture partners of CNR, and alternate bidder CSR, which the MBTA rated as "Unacceptable," planned to merge into a single entity "partly in an effort to win more overseas contracts" as they will no longer be "competing against each other."

122. The next day,  The South China Morning Post reported that the merger was being pushed by the Chinese central government and quoted CNR's board secretary Xie Jilong as saying that "the merger 'has become a national strategy' that was to be decided by the government, not the companies."  When the merger is consummated, the "new" CSR/CNR will have total revenue in excess of (U.S.) $30 billion, a veritable railcar behemoth that, according to China's state news agency, will face intense antitrust scrutiny around the world.

123.  There is no possible way, at least not without the expenditure of substantial, and wasteful, resources, for the MBTA to effectively manage to supervise the "winning bidder" and the "losing bidder," in performing on the Contract as to which CSR was rated "Unacceptable" in the critical areas of Technical Approach, Manufacturing and Quality.

124.  On August 13, 2014, CNR disclosed to the MBTA the potential for it and CSR to "join" during the MBTA's interview with CNR.  In the context of describing CNR's

Massachusetts facility, Mr. Lu stated "[a]nd also in the future, maybe we will join with CSR […] who come here, set up base, that before the future all the Chinese railway companies' space."

125.  At the very minimum, CNR's August 13, 2014 remarks were incomplete and did not convey what is now known, namely that "Acceptable" CNR and "Unacceptable" CSR are slated to become one in the same enterprise.

126.  Moreover, upon information and belief, pending shareholder and regulatory approval, "Acceptable" CNR will be acquired by "Unacceptable" CSR pursuant to a deal contemplated to give CSR shareholders 51% of the combined company.

127.  Upon information and belief, the merger transaction was in the works as early as August 2014 and CNR's failure to fully disclose a potential transaction with another bidder to the same RFP reeks of potential collusion between CNR and CSR.

128.  CNR should therefore be disqualified as a bidder for lacking the requisite candor and veracity necessary to participate in a public bidding process in Massachusetts.

129.  Notwithstanding CNR's incomplete and misleading statement on August 13, 2014, if the MBTA was aware of the proposed merger of CNR and CSR before the MassDOT Board vote, the MBTA failed to disclose it to the MassDOT Board in its recommendation of CNR, which further undermines the legitimacy of its recommendation to the MasDOT Board.

130.  Because it appears that the proposed merger was not disclosed to the MassDOT Board, then it was simply impossible for the MassDOT Board to discharge its fiduciary duties to its multiple stakeholders, which include the MBTA ridership and the taxpayers of the Commonwealth.

131.  The MassDOT Board, in discharging its fiduciary duties to the taxpayers, the MBTA ridership and others, have the obligation to, at the very minimum, thoroughly and

transparently investigate CNR, CSR, the proposed merger and the MBTA's bidding process for the RFP, but it failed to do so.

132.  Nor is there any excuse for the inaction by the MassDOT Board.  The time that it may take to enjoin the award in order to review this procurement process now will be time well spent in assuring taxpayers, the MBTA ridership and the public that this procurement has at least the chance to be successful.

## HRC is the Lowest Responsible and Eligible Bidder

133.  HRC is a bidder and otherwise "interested party" in the RFP.

134.  HRC's Technical Proposal was rated "Acceptable" by the MBTA.

135.  HRC's Price Proposal of $720.6 million, including all options, was the next lowest bid after CNR's Price Proposal and closer to the ICE lower range than CNR's Price Proposal.

136.  The MBTA found HRC's Price Proposal to be complete and responsive, reasonable and realistic, balanced and responsible.

137.  MBTA's Price Proposal Advisory Report failed to identify any risks or other negative considerations with regard to HRC's Price Proposal.

138.  HRC is the lowest responsible and eligible bidder and under the Bidding Law and, therefore, as a matter of law HRC should have been awarded the Contract.

139.  HRC will suffer irreparable harm if the award of the Contract to CNR is not enjoined.

## The Award to CNR and Public Records Requests

140.  On October 22, 2014, the MBTA recommended that the MassDOT Board award the Contract to CNR.  The MassDOT Board accepted the MBTA recommendation without debate and with nary a question and unanimously awarded the Contract to CNR.

141.  On October 23, 2014, HRC by its counsel submitted public records requests to the MBTA, MassDOT, Patrick, and the Office of the Governor pursuant to Mass. Gen. Laws c. 66, § 10 (the "Public Records Law"), seeking records relating, *inter alia*, to the Hong Kong Meeting with CNR's Chinese joint venturers and the procurement process, the evaluation of each of the bidders, communications with CNR and its Chinese joint venture partners, communications with legislators and any other elected or appointed public officials and other matters that are directly relevant to the procurement at issue.

142.  On November 12, 2014, outside counsel to the MBTA contacted HRC regarding its public records request by letter and subsequent telephone calls informing HRC that its public records requests sufficiently overlap with those made by other requesters, Bombardier and Kawasaki, that the MBTA recommended cost sharing for the review and disclosure of the overlapping public records requests.

143.  To date, MassDOT has failed to respond at all to HRC's request for public records directed to it.

144.  On November 19, 2014, the MBTA made an initial public records disclosure of basic procurement materials. This production contained no electronically stored information (*i.e.*, emails) for any MBTA or MassDOT custodians.

145.  On December 5, 2014, the Office of the Governor produced several pages of inconsequential public records in response to HRC's request, but failed to produce any of the communications requested.  The Office of the Governor has not informed HRC of the status of the remainder of its public records request.

146. In or about December 2014, outside counsel for the MBTA proposed engaging an electronic discovery vendor to process, filter and host the electronic data response to the public records request.

147. Upon information and belief, as of January 20, 2015, outside counsel for the MBTA has not even begun its review of the email data collected in response to HRC's public records request.

148. Upon information and belief, as of January 20, 2015, the MassDOT had not yet even collected the email data from Davey despite HRC and other requesters identifying him as a priority custodian.

149. To date, nearly two and a half months after receiving HRC's public records requests, neither the MBTA, MassDOT, nor the Office of the Governor have produced any records that bear most directly on the core defects of the procurement process.

150. HRC expects that the outstanding electronic data will reveal more about what occurred at the Hong Kong meeting in December 2013 and thereafter, such as:

- Who from CNR or CNR's joint venturers was at the meeting?  Who from MassDOT and the MBTA attended the meeting?

- What was discussed? Did anyone take notes?

- How much did CNR or CNR's joint venturers promise about its new $60 million Massachusetts corporate headquarters?

- How many jobs did CNR or CNR's joint venturers promise over and above the jobs that would be created by the other bidders?

- Did CNR or CNR's joint venturers make a formal presentation? Did any of CNR's bid team or agents have improper discussions or dealings with the MBTA or others?

- What follow-up communications by and among CNR, CNR's joint venturers, Sojitz,  the MBTA, MassDOT Board, Davey, Patrick, and members of the Legislature or other public officials occurred?

151.  HRC also believes that the outstanding electronic data will reveal more about why the MBTA relaxed the Past Performance Technical criterion, whether or not it was related to the Hong Kong Meeting, CNR's promise to locate its North American headquarters in Massachusetts and invest an additional $60 million, or some other reason.

### Post Bid Administrative Protest

152.  On October 27, 2014, HRC submitted a bid protest to the MBTA.

153.  On October 30, 2014, HRC submitted a supplemental bid protest to the MBTA and forwarded both protests to the designated Chief Procurement Officer, Silvio Petraglia, on October 31, 2014.

154.  On November 10, 2014, the MBTA's General Counsel informed HRC of an extended procedure for protesting the award of the Contract.

155.  On November 13, 2014, HRC sought written assurances from the MBTA that it would not take actions, including entering into a formal agreement or issuing an NTP to CNR, that could potentially affect the appeal process, until a reasonable time after the final determination of the appeal procedure.

156.  The MBTA refused to give HRC written assurances, thereby undermining the legitimacy of the internal MBTA administrative appeal process and potentially rendering it a farce.

157.  The MBTA extended the deadline for all bid protests to December 8, 2014.

158.  HRC submitted a consolidated bid protest on December 8, 2014.

159.  In light of the outstanding public records requests, HRC has reserved its right to supplement its bid protest to present additional grounds for challenging the Contract award.

160.  Upon information and belief, Bombardier and Kawasaki also submitted bid protests to the MBTA on or about December 8, 2014.

161.  On January 7, 2015, the MBTA notified counsel for HRC by facsimile that the time for the MBTA's Chief Procurement Officer to issue a written determination of the Protest was being extended to February 9, 2015.

162.  As of January 7, 2015, 75 days had passed since the MassDOT Board awarded the Contract to CNR.

163.  On January 14, 2015, but only in response to a direct inquiry, HRC was informed by counsel to the MBTA that the MBTA has issued an NTP to CNR, presumably giving it the green light to proceed and thus making a mockery of HRC's pending administrative appeal and not even paying lip service to due process under the law.

164.  On January 20, 2015, in response to its Public Record Request, HRC learned that the MBTA secretly and without notice to the other bidders, including HRC, entered into a contract with CNR on November 19, 2014, at a time when the administrative appeal period was only commencing.

165.  On January 20, 2015, in response to its Public Records Request, HRC learned that the MBTA issued a NTP to CNR on December 18, 2014.

166.  The issuance of an NTP to CNR, will cause HRC to suffer irreparable harm.

## Count I

### Against MBTA, MassDOT, the MassDOT Board and CNR for a Declaratory Judgment

167.  HRC incorporates the allegations of paragraphs 1 through and including 166 as if set forth in full herein.

168.  As a matter of law, the MassDot Board owes to all of its stockholders and interested parties fiduciary duties of due care and fair dealing and to comply with the Bidding Law. Moreover, the RFP creates an implied contract between the MBTA and all bidders, including HRC.

169.  A genuine and actual controversy exists as to whether the MBTA, MassDOT and the MassDOT Board violated the Bidding Law and the implied contract by awarding the Contract to CNR, who was not the lowest responsible and eligible bidder on the RFP, and by failing to award the Contract to HRC, who is the lowest responsible and eligible bidder.

170.  Pursuant to 28 U.S.C. § 2201, the Court should declare as a matter of law that (a) the MBTA, MassDOT and the MassDOT Board violated the Bidding Law and the implied contract by awarding the Contract to CNR; (b) CNR is neither a responsible nor eligible bidder under the Bidding Law; and (c) HRC is the lowest responsible and eligible bidder and is entitled to the award of the Contract.

## Count II

### Against MBTA, MassDOT, the MassDOT
### Board and CNR for Injunctive Relief

171.  HRC incorporates the allegations of paragraphs 1 through and including 170 as if set forth in full herein.

172.  HRC has suffered and will in the future continue to suffer irreparable harm if the MBTA, MassDOT, the MassDOT Board and CNR continue to violate their obligations under the Bidding Law.

173.  As a result of the foregoing, HRC is entitled to a preliminary and permanent injunction enjoining and restraining the MBTA, MassDOT and the MassDOT Board and CNR from proceedings in any fashion with the Contract.

## Count III

### Against MBTA, MassDOT, Patrick and the Office of the Governor for
### Injunctive Relief for Violation of Mass. Gen. Laws c. 66, § 10

174.  HRC incorporates the allegations of paragraphs 1 through and including 173 as if set forth in full herein.

175.  The MBTA, MassDOT, Patrick and the Office of the Governor have failed and refused to comply with their respective obligations under the Public Records Law, all as set forth in paragraphs 140 through and including 151, *supra*.

176.  HRC has suffered and will in the future continue to suffer irreparable harm if the MBTA, MassDOT, Patrick and the Governor continue to violate their obligations under the Public Records Law.

177.  As a result of the foregoing, HRC is entitled to a temporary restraining order and, after hearing, a preliminary and permanent injunction requiring the MBTA, MassDOT, Patrick

and the Office of the Governor to comply with their obligations under the Public Records Law and to produce all documents, in whatever form or format, that are responsive to HRC's public records requests.

## Count IV

## Against CNR for Violation of Mass. Gen. Laws c. 93A, § 11

178.  HRC incorporates the allegations of paragraphs 1 through and including 177 as if set forth in full herein.

179.  CNR's actions as alleged herein constitute unfair and/or deceptive acts or practices which occurred within trade or commerce.

180.  CNR's actions occurred primarily and substantially within Massachusetts, in connection with the RFP for a Massachusetts-based project.

181.  As a result of these actions, HRC has suffered and continues to suffer, a loss of its money or property and irreparable harm, including but not limited to its reasonably foreseeable profits from performance of the Contract.

**WHEREFORE**, HRC demands judgment against the Defendants as follows:

**(a)**  Under Count I, a binding declaration and judgment that (a) the MBTA, MassDOT and the MassDOT Board violated the Bidding Law and the implied contract by awarding the Contract to CNR; (b) CNR is neither a responsible nor eligible bidder under the Bidding Law; and (c) HRC is the lowest responsible and eligible bidder and is entitled to the award of the Contract;

**(b)**  Under Count II, enter a preliminary and permanent injunction enjoining and restraining the MBTA, MassDOT, the Mass DOT Board, CNR and their respective officers, agents, servants, employees and attorneys, and all persons who are in active concert or participation with any of them, from proceeding in any fashion with the Contract;

**(c)**  Under Count III, enter a temporary restraining order and, after hearing, a preliminary and permanent injunction requiring the MBTA, MassDOT, Patrick and the Office of the Governor, and their respective officers, agents, servants, employees and attorneys, and all persons who are in active concert or participation with any of them, to comply with their obligations under the Public Records Law and to produce all documents, in whatever form or format, that are responsive to HRC's public records requests;

 **(d)**  Under Count IV, enter a preliminary and permanent injunction enjoining CNR from taking any actions whatsoever or to proceed with the Contract or, if the Court does not grant injunctive relief, award any and all damages to which HRC is entitled including all lost profits, all as may be ascertained at trial, which damages should be trebled pursuant to the Massachusetts Unfair Trade Practices Act, plus interest thereon;

**(e)**  Award to HRC its costs and expenses of action, including reasonable attorneys' and experts' fees and disbursements; and

**(f)**  Grant to HRC such further relief as is just.

Dated: January 20, 2015          **HYUNDAI ROTEM COMPANY**

By its attorneys,

*/s/ Larry L. Varn*
Larry L. Varn (BBO# 508130)
Kate R. Isley (BBO# 666371)
Katherine S. Kayatta (BBO# 675487)
PIERCE ATWOOD LLP
100 Summer Street, Suite 2250
Boston, MA 02110
Tel.: (617) 488-8100
Fax:  (617) 824-2020
lvarn@pierceatwood.com
kisley@pierceatwood.com
kkayatta@pierceatwood.com