## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

HYUNDAI ROTEM COMPANY,

                 Plaintiff,

BOMBARDIER TRANSIT CORPORATION,

                 Intervenor-Plaintiff,

        v.

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY, *et al.*,

                 Defendants.

**Civil Action No. 1:15-cv-10132-FDS**

## INTERVENOR-PLAINTIFF BOMBARDIER TRANSIT CORPORATION'S
## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Bombardier Transit Corporation ("Bombardier"), by its attorneys, Wilson Elser

Moskowitz Edelman & Dicker LLP, as and for its complaint against each of the defendants

named herein, except for CNR MA Corporation, alleges as follows:

     **1.**     As noted in the January 20, 2015 complaint of Hyundai Rotem Company

("HRC"), this action arises from a flawed and unlawful procurement process in which defendant

Massachusetts Bay Transportation Authority ("MBTA") recommended, and the Massachusetts

Department of Transportation ("MassDOT") Board of Directors (the "MassDOT Board")

authorized the General Manager and Rail and Transit Administrator to enter into, a contract (the

"Contract") with defendant CNR MA Corporation ("CNR") for the manufacture and delivery of

up to 284 new Red and Orange Line Vehicles for a total "not-to-exceed delivered cost of $566.6

million."[1]  On January 14, 2014, HRC and Bombardier were informed that the MBTA had issued

a Notice to Proceed ("NTP") to CNR with respect of the Contract notwithstanding the pendency

of  administrative appeals in which each of the other three bidders (Bombardier, HRC and

Kawasaki Rail Car Inc. ("Kawasaki")) have separately protested the award of the Contract to

CNR.[2]

  **2.** The procurement process was deeply and fundamentally flawed because the

MBTA failed to put the bidders on equal footing, made arbitrary and capricious decisions, failed

to adhere to the terms of the bid documents or do minimum due diligence of CNR, all in

violation of the applicable Massachusetts procurement laws and precedents[3].  The MBTA was

also influenced by improper communications which CNR's Chinese joint venture partners had

with defendant former Governor Deval Patrick ("Patrick") and defendant former Massachusetts

Secretary of Transportation and MassDOT Board Member Richard Davey ("Davey"), and

perhaps others, and accepted CNR's widely publicized, but improper, contingent offer to set up

its North American headquarters in Massachusetts and to invest an additional $60 million not

required by the Contract to sweeten CNR's bid.

  **3.** Bombardier, HRC and Kawasaki have each filed administrative protests with the

MBTA, and those protests are pending.  In the meantime, the MBTA, MassDOT, Patrick and the

Office of the Governor have failed to timely produce documents pursuant to public records

requests by Bombardier, HRC and Kawasaki pursuant to Mass. Gen. Laws. c. 66, § 10 (the

---

[1] The MBTA ultimately contracted with CNR for the sum of $568,766,875.

[2] Bombardier submitted a copy of its Protest to the Massachusetts Office of the Inspector General with a request pursuant to 945 CMR 1.04 that it initiate an investigation into the issues addressed in this protest, including CNR's impermissible meetings in Hong Kong with Governor Patrick and Secretary Davey in December of 2013, and the subsequent bid improprieties.  Upon information and belief, the Massachusetts Office of the Inspector General has initiated an investigation into the subject procurement.

[3] The subject bid documents fail to reference any specific Massachusetts procurement statutes or regulations. However, the MBTA appears to have adopted the "Best Value" procurement method set forth in 801 CMR 21.01.

"Public Records Law") and refused to provide Bombardier with assurances that it would not proceed with issuing a Notice to Proceed to CNR to or enter into a contract with CNR until a reasonable time after the determination of the administrative appeal.

4.      For reasons set forth in greater detail below, Bombardier seeks appropriate declaratory relief and:  (1) a preliminary injunction enjoining the MBTA from proceeding with the Contract; (2) a prompt hearing on the merits of Bombardier's claims; and (3) after hearing, a permanent injunction requiring the MBTA and the MassDOT Board to vacate the current procurement and re-initiate the bid process.

**Parties**

5.      Bombardier Transit Corporation is incorporated in the State of Delaware with a principal place of business in Horsham, Pennsylvania.  It is part of Bombardier Transportation, the global leader in the rail industry, with over 38,000 employees in 63 production and engineering sites in 26 countries and 19 service centers around the world.  Bombardier Transportation supplies complete trains as well as rail sub-systems, maintenance services, system integration and signaling.  Bombardier Transportation's base of rolling stock exceeds 100,000 rail cars and locomotives worldwide.

6.      Bombardier adopts and incorporates by reference paragraphs 5 through 18 of the Complaint for Declaratory and Injunctive Relief ("HRC Complaint") (ECF Document No. 1) filed by HRC on January 20, 2015.

**Jurisdiction and Venue**

7.      Jurisdiction and venue in this matter is not disturbed by Bombardier's intervention.

3

5378720v.2

8.      The Court continues to have jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because this action is brought by HRC and Bombardier, both foreign corporations, against defendants who are all citizens of the Commonwealth of Massachusetts and the amount in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand Dollars ($75,000).

9.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because all defendants reside in Massachusetts and a substantial part of the events giving rise to Bombardier and HRC's claims occurred in Massachusetts.

## Statement of Facts

10.      Bombardier adopts and incorporates by reference paragraphs 21 through 29 of the HRC Complaint.

11.      Bombardier engaged more than 100 employees to actively participate in the process of responding to the subject RFP, resulting in costs in excess of $1 million being incurred during more than a full year of efforts, and otherwise expended substantial time, resources, and capital in preparing a 1,000+ page bid submission.

### CNR's Joint Venturers' Campaign to Change the RFP and Their Improper Communications With Officials of the Commonwealth, Including the Governor

12.      Bombardier adopts and incorporates by reference paragraphs 30 through 43 of the HRC Complaint.

5378720v.2

**MBTA Acquiesces to CNR's Joint Venturers' Campaign
to Strip North American Requirements from the RFP**

13.     Bombardier adopts and incorporates by reference paragraphs 44 through 49 of the HRC Complaint.


**MBTA Further Acquiesces to CNR's Joint Venturers' Campaign
to Abandon the 100-Point Numerical Rating Method**

14.     Upon information and belief, Sojitz Corporation of America ("Sojitz"), acting as an agent for one or both of China CNR and/or CNR Changchun, the joint venture partners of CNR, submitted multiple Requests for Clarification ("RFC") concerning the RFP.   As noted in paragraphs 32 to 49 of the HRC Complaint, although these communications were styled as a requests for "clarification," in substance they sought material amendments to the RFP so as to remove from it any language relating to the North American market, specifically the phrases "Past Performance on similar size and scope projects in the North American Market will weigh heavily in the evaluation" and "List North American projects first" from the Past Performance criteria in the RFP.

15.     On March 4, 2014, only two business days after Sojitz's third request that all references to the North American market be removed from the RFP (and after CNR's flagrantly impermissible, private ex parte meeting(s) in Hong Kong with Patrick and Davey), the MBTA tamely acquiesced by substantially relaxing the RFP North American requirements to the sole benefit of CNR.   Simultaneously, to the benefit of CNR, MBTA changed the method by which the bidders' submissions would be rated from an objective, numerical 100-point tabulation to an ambiguous, murky "qualitative/descriptive method," assigning subjective ratings of "Exceptional," "Good," "Acceptable," "Potential to Become Acceptable" and "Unacceptable."

16.     The subjective "qualitative/descriptive" evaluation necessarily obscures the relative differences between bids, favoring bidders such as CNR and others who were weak as to Technical Approach and Past Performance, two of the three most heavily weighted Technical Evaluation Criteria pursuant to the bid documents.

17.     The RFP makes it clear that the contract would be awarded based upon "Best Value" rather than merely price:  technical evaluation factors are more important than lowest price -- only when bids are determined to be technically comparable does price become more important.

18.     Given the RFP's emphasis on technical evaluation factors, the only "cure" for this impermissible and radical change in technical evaluation methodology, particularly so early in the RFP process, is for the procurement to be cancelled and the Contract re-bid.


### The MBTA's Arbitrary and Capricious Evaluation of Proposals

19.     Bombardier adopts and incorporates by reference paragraphs 50 through 56 of the HRC compliant.


### North American Safety Rail Design and Welding Standards

20.     Bombardier adopts and incorporates by reference paragraphs 57 through 63 of the HRC Complaint.

21.     Stainless steel railcar body construction is a very complex manufacturing process and American manufacturing standards are especially stringent and difficult to meet.  Unlike the other bidders, CNR has absolutely no experience meeting North American safety standards (ASME RT-2 and AWS standards) and CNR's proposal in no way demonstrated that CNR would be able to meet North American Safety standards on this project.  CNR's proposal failed

to even reference them, thus demonstrating either total ignorance of or complete indifference to the reliability of the vehicles and the safety of the Red and Orange Line ridership.

22.     Notwithstanding these glaring omissions in CNR's proposal, which it never supplemented, the MBTA inexplicably and irrationally awarded CNR an "Acceptable" rating for "Technical Approach."  However, the March 4, 2014 change in the ratings method contained in Addendum No. 7 to the RFP allowed the MBTA to obfuscate the relative differences in ratings between CNR and the other bidders and thus give unfair and unlawful preferential treatment to CNR.

**Manufacturing Capacity of CNR and Its Suppliers**

23.     Bombardier adopts and incorporates by reference paragraphs 66 through 70 of the HRC Complaint.

**CNR's Lack of North American Past
Performance and Absence of Reliability Information**

24.     Bombardier adopts and incorporates by reference paragraphs 71 through 84 of the HRC Complaint.

**MBTA's Abuse of Discretion as to Bombardier's Proposal
Demonstrates the Clear Favoritism Provided To CNR**

25.     Over and above the improprieties in the procurement process and the abuse of discretion as to CNR's technical proposal, the MBTA's abuse of discretion in evaluating Bombardier's proposal further demonstrates the favoritism afforded CNR and the absence of genuine and fair competition in the bidding process.

5378720v.2

**Bombardier's Final Assembly Capacity**

26.     The MBTA Selection Committee rated Bombardier's Final Assembly Capacity as "Potential to Become Acceptable" rather than "Acceptable," based upon a finding that Bombardier's proposed final assembly staffing and shop floor space was insufficient to meet RFP final assembly requirements.

27.     The MBTA conceded, however, that this conclusion was based upon ***intuition*** rather than any underlying facts, data, or analysis.

28.     Bombardier has vast railcar manufacturing experience in federally-funded contracts that require compliance with Buy America provisions almost identical to those in the subject RFP and has never failed any audit to confirm that the scope of the work was appropriate. Bombardier is uniquely qualified, based upon this experience, to certify that the final assembly staffing and shop floor space it allocated was more than sufficient to fully comply with the precise requirements of the RFP specifications.

29.     Particularly in view of this vast experience, it was an abuse of discretion for the MBTA to find that Bombardier's Final Assembly Proposal was insufficient based on ***intuition*** alone.

**Bombardier's Final Assembly Site Selection**

30.     The MBTA Selection Committee rated Bombardier's Final Assembly Site Selection as "Potential to Become Acceptable" rather than "Acceptable" based upon Bombardier's decision not to commit to a single site prior to contract award.

31.     Bombardier has vast experience with local assembly requirements.  It provided the MBTA Selection Committee with a detailed list of 22 potential Final Assembly locations, emphasizing the need for flexibility and contingency planning in order to avoid local

5378720v.2

administrative delays.   At the time of its August, 2014, technical presentation, Bombardier had visited 11 of the 22 locations and had detailed information about them.   Each location featured existing structures -- none involved the construction of buildings from the ground up.

32.     In contrast to Bombardier's "Potential to Become Acceptable" rating, the MBTA Selection Committee rated CNR's Final Assembly Site Selection as "Good" despite the fact that CNR proposed building a permanent facility at a single location from the ground up, with no contingency planning, and had not received the necessary permits to build its facility at the time of its August 2014 technical interview.  This approach presented an obvious and substantial risk that CNR would be unable to comply with production requirements.  At the same time, it offered the obvious political gain associated with the investment and jobs afforded by such a $60 million commitment over and above the requirements of the RFP.

### Bombardier's Proposed Time to Prepare its Final Assembly Site

33.     The MBTA Selection Committee abused its discretion in rating Bombardier's Time to Prepare Final Assembly Site as "Potential to Become Acceptable" rather than "Acceptable."

34.     The MBTA incorrectly based this rating upon the mistaken impression that Bombardier had allotted only seven months for final assembly site preparation when its Technical Proposal clearly sets forth more than eight months for that work.

35.     Unlike CNR's proposal, no material modifications or renovations were required at Bombardier's proposed Massachusetts facility.

36.     The MBTA failed to recognize Bombardier's vast experience staffing local final assembly sites.

37.     Bombardier entered the U.S. rail transportation market in 1976 and has a long history of investment and success in this market, with a market share of 42% through 2011-2013. Approximately 5,000 Bombardier rail vehicles move people each day.  This includes more than 1,800 subway cars in service at New York City Transit, over 300 stainless steel MultiLevel commuter coaches at New Jersey Transit, and more than 1,100 electric multiple unit commuter cars serving New York and Connecticut on the Long Island Rail Road and Metro-North Railroad.  Bombardier's rail business employs more than 2,600 U.S. workers across 14 states including at manufacturing facilities near Pittsburgh, PA and in Plattsburgh, NY.

38.     Bombardier is clearly the market leader of rail transit vehicles in North America. As a result, Bombardier has become an expert in performing U.S. projects with U.S. final assembly requirements.  In particular, this includes the Buy America final assembly requirements which are the same as the RFP final assembly requirements.  Bombardier's experience with Buy America Final Assembly requirements, and therefore with this RFP's requirements, derives from having manufactured a significant number of passenger rail cars on FTA-funded projects including NJT, MARC, BART, NYCT R179, and CTA Series 5000.  This presently includes new rail equipment and systems for other U.S. regions such as 775 metro cars for the city of San Francisco, Bay Area Rapid Transit (BART) and 300 metro cars for the New York City Transportation Authority, both projects for which Bombardier has been recently audited with success as per the applicable statutory requirements.

39.     Bombardier's proposed accelerated delivery schedule further demonstrated the acceptability of Bombardier's proposed eight-month timeline for final assembly site preparation. This schedule would create a "buffer" for preparation of the final assembly site by delivering cars ahead of the required delivery schedule.

40.     In stark contrast to Bombardier's proposal, CNR proposed 24 months of preparation for final assembly with regard to its to-be-built facility.  While 24 months may be needed for the work proposed by CNR, this period of time would be completely unnecessary for merely leasing a facility and performing only that local assembly set forth in the RFP.  Based upon the above, the Selection Committee abused its discretion by rating Bombardier "Potential to Become Acceptable" as to Time to Prepare the Final Assembly Site.

**Bombardier's Proposed Assembly Procedures**

41.     The MBTA Selection Committee abused its discretion in rating Bombardier's Proposed Assembly Procedures as "Potential to Become Acceptable" rather than "Acceptable."

42.     The Selection Committee asserted that Bombardier failed to provide "assembly procedures, controls, and sample material control program for the final assembly facility," when the MBTA itself had confirmed that Bombardier's procedures and controls were provided during the MBTA's La Pocatière and Plattsburgh site visits in June 2014. This was an abuse of discretion.

**The MBTA Allowed CNR to Compensate for Its Deficient Technical Rating**

43.     Bombardier adopts and incorporates by reference paragraphs 85 through 93 of the HRC Complaint.

**CNR's Wrongful Sweetening of the Deal with a
Promise of a North American Headquarters**

44.     Bombardier adopts and incorporates by reference paragraphs 94 through 104 of the HRC Complaint.

11

**CNR's Price Proposal Is Unreasonable, Predatory and Dangerously Low**

45.     Bombardier adopts and incorporates by reference paragraphs 105 through 116 and 119 through 120 of the HRC Complaint.

**CNR's "Priced to Win" Proposal Prematurely Halted the Evaluation Process:**
**The Lack of Any "Best and Final Offer" Phase of Bidding**

46.     The RFP reserves the MBTA's right, after the evaluation of initial proposals, to issue "Proposal Modifications and Clarification Guidelines" setting forth additional amendments to the RFP and specifying the form of "the best and final offer" or "BAFO."

47.     Almost all major rail procurements include a BAFO stage in order to ultimately obtain the best price for the involved Authority.

48.     Bidders on this RFP were advised in August of 2014 that they should be prepared to submit a BAFO within weeks, rather than months, of their technical presentations.

49.     Upon information and belief, the bidders' price proposals were opened shortly after these technical presentations at the conclusion of the MBTA Technical Evaluations.

50.     As noted in HRC Complaint paragraphs 105 to 116, CNR's price proposal was dangerously low:  32.99% lower than the Upper Range of the MBTA's Independent Cost Estimate ("ICE") and $198.4 million or 25.9% lower than the Lower Range of the ICE.  CNR's Capital Spare Parts proposal was more than 50% lower than the associated ICE.

51.     Although the RFP allowed for the MBTA to request CNR's certified cost and pricing data, it did not do so.

52.     CNR's price proposal was so far below those put forth by the competitors (approximately 21% below HRC, 43% below Kawasaki and 48% below Bombardier) that the bid evaluation process came to an abrupt end, with no BAFO stage.

53.     But for CNR's dangerously low bid, it is clear that the bid evaluation process would have entered the BAFO stage, allowing all bidders to adjust bid pricing.

54.     MBTA's determination to proceed without a BAFO arose out of the flawed and unlawful procurement process.

55.     Once CNR's bid is disqualified by the Court, and in consideration of the flawed and unlawful procurement process, it would be unreasonable to award the bid to the next lowest bidder before a BAFO stage.  The contract must be rescinded and re-bid such that all bidders are an equal footing.

**CNR's Lack of Candor Regarding Its Merger with "Unacceptable" CSR**

56.     Bombardier adopts and incorporates by reference paragraphs 121 through 132 of the HRC Complaint.

**Bombardier is a Responsible and Eligible Bidder**

57.     Bombardier is a responsible and eligible bidder and otherwise "interested party" in the RFP.

58.     Bombardier's Technical Proposal was rated "Acceptable" by the MBTA.

59.     The MBTA found Bombardier's Price Proposal to be complete and responsive, reasonable and realistic, balanced and responsible.

60.     Bombardier will suffer irreparable harm if the award of the Contract to CNR is not enjoined.

5378720v.2

**The Award to CNR and Public Records Requests**

**61.**    On October 22, 2014, the MBTA recommended that the MassDOT Board award the Contract to CNR.  The MassDOT Board accepted the MBTA recommendation without debate and with nary a question and unanimously awarded the Contract to CNR.

**62.**    Two days later, on October 24, 2014, Bombardier provided written notification to the MBTA of its intention to protest the award of the Contract.

**63.**    Bombardier, both directly and by its counsel, submitted public records requests pursuant to Mass. Gen. Laws c. 66, § 10 (the "Public Records Law") to the MBTA and/or MassDOT on October 22 and 29; November 4 and 5; and January 7 and 8.  Additional requests were submitted to the Office of the Governor on October 27 and November 4.  These requests seek records relating, inter alia, to the Hong Kong Meeting with CNR's Chinese joint venturers and the procurement process, the evaluation of each of the bidders, communications with CNR and its Chinese joint venture partners, communications with legislators and any other elected or appointed public officials and other matters that are directly relevant to the procurement at issue.

**64.**    On November 12, 2014, outside counsel to the MBTA contacted Bombardier regarding its public records request by letter and subsequent telephone calls informing Bombardier that its public records requests sufficiently overlap with those made by other requesters, HRC and Kawasaki, that the MBTA recommended cost sharing for the review and disclosure of the overlapping public records requests.

**65.**    To date, MassDOT has failed to respond at all to Bombardier's request for public records directed to it.

**66.**    On November 19, 2014, the MBTA made an initial public records disclosure of basic procurement materials. This production contained no electronic communication (i.e., emails) for any MBTA custodians.

14

67.     On December 5, 2014, the Office of the Governor produced several pages of inconsequential public records in response to Bombardier's request, but failed to produce any of the communications requested.  The Office of the Governor has not informed Bombardier of the status of the remainder of its public records request.

68.     In or about December 2014, outside counsel for the MBTA proposed engaging an electronic discovery vendor to process, filter and host the electronic data response to the public records request.

69.     Upon information and belief, as of January 28, 2015, outside counsel for the MBTA has not even begun its review of the email data collected in response to Bombardier's public records request.

70.     Upon information and belief, it was not until January 23, 2015, MassDOT finally collected the email data from Davey despite Bombardier's specific request for his email correspondence on October 27, 2014, and subsequently identifying him as a priority custodian.

71.     To date, more than three months after receiving Bombardier's public records requests, the MBTA, MassDOT and the Office of the Governor have not produced any records that bear most directly on the core defects of the procurement process.

72.     Bombardier expects that the outstanding electronic data will reveal more about what occurred at the Hong Kong meeting in December 2013 and thereafter, such as:

- Who from CNR or CNR's joint venturers was at the meeting?  Who from MassDOT and the MBTA attended the meeting?

- What was discussed? Did anyone take notes?

- How much did CNR or CNR's joint venturers promise about its new $60 million Massachusetts corporate headquarters?

- How many jobs did CNR or CNR's joint venturers promise over and above the jobs that would be created by the other bidders?

- Did CNR or CNR's joint venturers make a formal presentation? Did any of CNR's bid team or agents have improper discussions or dealings with the MBTA or others?

- What follow-up communications by and among CNR, CNR's joint venturers, Sojitz,  the MBTA, MassDOT Board, Davey, Patrick, and members of the Legislature or other public officials occurred?

73.    Bombardier also believes that the outstanding electronic data will reveal more about why the MBTA relaxed the Past Performance Technical criterion, whether or not it was related to the Hong Kong Meeting, CNR's promise to locate its North American headquarters in Massachusetts and invest an additional $60 million, or some other reason.


**Post Bid Administrative Protest**

74.    On October 24, 2014, Bombardier submitted a Notice of Bid Protest to the MBTA/MassDOT designated Chief Procurement Officer, Silvio Petraglia.

75.    On November 10, 2014, the MBTA's General Counsel informed Bombardier of an extended procedure for protesting the award of the Contract.

76.    On November 13, 2014, HRC sought written assurances from the MBTA that it would not take actions, including entering into a formal agreement or issuing an NTP to CNR, that could potentially affect the appeal process, until a reasonable time after the final determination of the appeal procedure.

77.    The MBTA refused to give HRC or Bombardier written assurances, thereby undermining the legitimacy of the internal MBTA administrative appeal process and potentially rendering it a farce.

78.    The MBTA extended the deadline for all bid protests to December 8, 2014.

79.     Bombardier submitted a bid protest on December 8, 2014.  (See **Exhibit 2** to Motion for Intervention by Bombardier Transit Corporation, ECF Document 5-2.)

80.     In light of the outstanding public records requests, Bombardier has reserved its right to supplement its bid protest to present additional grounds for challenging the Contract award.

81.     Upon information and belief, HRC and Kawasaki also submitted bid protests to the MBTA on or about December 8, 2014.

82.     On January 7, 2015, the MBTA notified counsel for Bombardier that the time for the MBTA/MassDOT's Chief Procurement Officer to issue a written determination of the Protest was being extended to February 9, 2015.

83.     On January 14, 2015, but only in response to a direct inquiry by HRC, all protesting bidders were for the first time informed by counsel to the MBTA that the MBTA had already issued a "Notice to Proceed" to CNR, presumably giving it the green light to proceed and thus making a mockery of the pending administrative appeals by all three other bidders and not even paying lip service to due process under the law.

84.     On January 20, 2015, in response to Public Record Requests, the three protesting bidders learned for the first time that the MBTA secretly and without notice to the other bidders, including Bombardier, had entered into a contract with CNR on November 19, 2014, at a time when the protest period was only commencing, yet after both Bombardier and HRC, and upon information and belief Kawasaki, had submitted formal protests to the MBTA or otherwise provided written notification to the MBTA of an intention to submit a formal protest.

85.     On January 20, 2015, in response to Public Records Requests, the three protesting bidders learned for the first time that the MBTA issued a Notice to Proceed to CNR on December 18, 2014.

86. MBTA's issuance of the Notice to Proceed to CNR, and any work undertaken by CNR in response, will cause Bombardier to suffer irreparable harm.

## Count I

### Against MBTA, MassDOT and the MassDOT Board
### for a Declaratory Judgment

87. Bombardier incorporates the allegations of paragraphs 1 through 86 as if set forth in full herein.

88. As prescribed by statute, the MassDOT Board shall conduct themselves in a manner so as to render decisions that are fair and impartial and in the public interest, avoid impropriety and the appearance of impropriety in all matters under their jurisdiction, avoid all prohibited communications, require staff and personnel subject to their direction and control to observe the same standards of fidelity and diligence, and disqualify themselves from proceedings in which their impartiality might reasonably be questioned; and refrain from financial or business dealings which would tend to reflect adversely on impartiality. Moreover, the RFP creates an implied contract between the MBTA and all bidders, including Bombardier.

89. A genuine and actual controversy exists as to whether the MBTA, MassDOT and the MassDOT Board violated the applicable procurement laws and the implied contract by awarding the Contract to CNR.

90. Pursuant to 28 U.S.C. § 2201, the Court should declare as a matter of law that the MBTA, MassDOT and the MassDOT Board violated applicable procurement laws and the implied contract by awarding the Contract to CNR and that CNR is neither a responsible nor eligible bidder under the applicable procurement laws.

5378720v.2

## Count II

### Against MBTA, MassDOT and the MassDOT Board
### for Injunctive Relief

**91.**     Bombardier incorporates the allegations of paragraphs 1 through 90 as if set forth

in full herein.

**92.**     Bombardier has suffered and will in the future continue to suffer irreparable harm

if the MBTA, MassDOT and the MassDOT Board continue to violate their obligations under the

applicable procurement laws.

**93.**     As a result of the foregoing, Bombardier is entitled to a preliminary and

permanent injunction enjoining and restraining the MBTA, MassDOT and the MassDOT Board

and their respective officers, agents, servants, employees and attorneys, and all persons who are

in active concert or participation with any of them, from proceedings in any fashion with the

Contract, ordering MBTA to direct CNR to cease all actions in furtherance of the Contract,

ordering MBTA to cancel the contract with CNR, and ordering MBTA to re-bid the Contract.

**WHEREFORE**, Bombardier demands the following:

**(a)**  Under **Count I**, a binding declaration and judgment that (a) the MBTA, MassDOT

and the MassDOT Board violated applicable procurement laws and the implied contract

by awarding the Contract to CNR and (b) CNR is neither a responsible nor eligible bidder

under the applicable  procurement laws;

**(b)**  Under **Count II**, a preliminary and permanent injunction (a) enjoining and

restraining the MBTA, MassDOT and the MassDOT Board, and their respective officers,

agents, servants, employees and attorneys, and all persons who are in active concert or

participation with any of them from proceedings in any fashion with the Contract; (b)

ordering MBTA to direct CNR to cease all actions in furtherance of the Contract; (c) ordering MBTA to cancel the contract with CNR; and, (d) ordering MBTA to re-bid the Contract.

**(c)**  An award to Bombardier of its costs and expenses of action, including reasonable attorneys' and experts' fees and disbursements; and

**(d)**  A grant to Bombardier such further relief as is just.


Dated: January 28, 2015                    **BOMBARDIER TRANSIT CORPORATION**

By its attorneys:

/s/ George C. Rockas
George C. Rockas, BBO # 544009
George.Rockas@wilsonelser.com
Erik J. Tomberg, BBO# 669413
Erik.Tomberg@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker LLP
260 Franklin Street, 14th Floor
Boston, Massachusetts 02110-3112
(617) 422-5301

20