# **Exhibit 1**

**to Affidavit of Thomas W. Tobin In Support of Intervenor-Plaintiff Bombardier's Opposition to Motions to Dismiss by Massachusetts Bay Transportation Authority and CNR MA Corporation**

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 2 of 14

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

2010 WL 6208658 (D.Mass.) (Trial Motion, Memorandum and Affidavit)
United States District Court, D. Massachusetts.

Carol SURPRENANT, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

MASSACHUSETTS TURNPIKE AUTHORITY, Massachusetts Port
Authority, and Massachusetts Department of Transportation, Defendants.

No. 09-10428-RGS.
September 27, 2010.

**Memorandum in Support of Defendants' Motion for Judgment on the Pleadings
on the Ground that Plaintiffs' Claims Are Barred by the Eleventh Amendment**

Martha Coakley, Attorney General of Massachusetts; Kenneth W. Salinger (BBO # 556967), Assistant Attorney General, Government Bureau, Office of the Attorney General, One Ashburton Place, Boston, MA 02108, 617.963.2075, ken.salinger@state.ma.us; William A. Zucker (BBO# 541240), wzucker @mccarter.com, Gregory D. Cote (BBO# 645943), gcote@mccarter.com, McCarter & English, LLP, 265 Franklin Street, Boston, MA 02110, (617) 449-6500.

**TABLE OF CONTENTS.**

| | |
|---|---|
| Introduction .................................................................................................................... | 1 |
| Background ..................................................................................................................... | 1 |
| 1. Disposition and Status of Original Defendants' Motions to Dismiss ......................................... | 1 |
| 2. Creation of the Massachusetts Department of Transportation, and Transfer of Tunnel and Bridge Operations, Toll Collection, and Liabilities .................................................................. | 2 |
| 3. Amended Complaint and Sovereign Immunity and Eleventh Amendment Defenses .............. | 3 |
| Argument ........................................................................................................................ | 4 |
| I. Under the Eleventh Amendment, the Court Lacks Power to Hear Most Claims Against an Agency of the Commonwealth of Massachusetts ..................................................................... | 4 |
| II. Now that Implementation of and All Liabilities Associated With the Resident Toll Discounts Have Been Transferred to the Department, Surprenant's Claims In This Action Are Barred by the Commonwealth's Sovereign Immunity and the Eleventh Amendment ................... | 5 |
| A. The Department Is an "Arm of the State" that Is Protected By the Eleventh Amendment ...... | 5 |
| 1. The Supreme Court and First Circuit Criteria ...................................................................... | 5 |
| 2. Application of the Criteria to the Department ..................................................................... | 7 |
| a. Explicit Indicators: The Legislature Has Stated that the Department Should Be Treated Like Other State Agencies and Share in the Commonwealth's Sovereign Immunity ............................ | 8 |
| b. Implicit Indicators: The Department's Functions, Structure, and Relationship to the Commonwealth, Confirm that It Is an Arm of the State .............................................................. | 10 |
| B. Surprenant Cannot Evade the Eleventh Amendment on the Ground that the MTA Previously Ran the Tunnels and Massport Previously Ran the Bridge ......................................................... | 15 |
| C. Neither Exception to Eleventh Amendment Immunity Applies ............................................... | 17 |
| 1. Congress Did Not Abrogate the Commonwealth's Immunity ................................................. | 17 |
| 2. The Commonwealth Did Not Waive Its Immunity ................................................................ | 18 |
| Conclusion ....................................................................................................................... | 20 |

**Introduction.**

Even if plaintiff Carol Surprenant had stated an otherwise viable dormant Commerce Clause claim--which she has not, as further demonstrated in Defendants' supplemental memorandum and supporting affidavits--the

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 3 of 14

Carol SUPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

Eleventh Amendment to the United States Constitution would bar the Court from granting Surprenant any relief. Although Surprenant originally filed this civil action against the Massachusetts Turnpike Authority ("MTA") and the Massachusetts Port Authority ("Massport"), since that time the Massachusetts Legislature: created the Massachusetts Department of Transportation (the "Department") as a new state agency; transferred ownership of the Ted Williams, Sumner, and Callahan Tunnels and Tobin Memorial Bridge as well as all liabilities associated with past operation of the tunnels and bridge from the MTA and Massport to the Department; abolished the MTA; and made the Department responsible for implementing the resident discount tolls at issue in this case. *See* Mass. St. 2009, c. 25; Mass. St. 2009, c. 120, § 42; First Amd. Compl., Dkt # 45, ¶¶ 2, 11.

As a result, the Eleventh Amendment now bars Surprenant's claims and this action must be dismissed pursuant to Fed. R. Civ. P. 12(c), even assuming that previously Surprenant could have brought this action against the MTA and Massport without running afoul of the Commonwealth of Massachusetts's immunity from suit in federal court. *See Maysonet-Robles v. Cabrero*, 323 F. 3d 43, 48-52 (1st Cir. 2003). "[T]he Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar" and " 'sets forth an explicit limitation on federal judicial power of such compelling force' " that it may be raised at any time, and may even be raised for the first time on appeal or on certiorari review by the Supreme Court. *Edelman v. Jordan*, 415 U.S. 651, 677-78 (1974) (quoting *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 467 (1945)).

**Background.**

**1. Disposition and Status of Original Defendants' Motions to Dismiss.**

Surprenant filed suit on March 20, 2009, against the MTA as owner and operator of the Sumner and Williams Tunnels, and against Massport as owner and operator of the Tobin Bridge. Compl., Dkt # 1, ¶¶ 6-9. Surprenant, a resident of Rhode Island, alleges that she used the Tobin Bridge and the Williams Tunnel "on several occasions" while travelling to other states for tourism and business purposes, and that she "paid tolls at those locations at the non-resident rate." First Amd. Compl., ¶ 7. She claims that the offering of discounted toll rates for these tunnels and bridge to residents of adjacent communities, as mandated by Massachusetts law, unconstitutionally discriminates against nonresident interstate travelers. See March 4, 2010 Mem. and Order, Dkt # 43, at 1; Compl., ¶¶ 32-37; First Amd. Compl., ¶¶ 36-40. Massport and the MTA moved to dismiss under Fed. R. Civ. P. 12(b)(6). A hearing was held on July 29, 2009.

On March 4, 2010, the Court dismissed the claim under the Privileges and Immunities Clause of Art. IV, § 2, cl. 1, after finding that "the impact of the resident discount program on Surprenant's ... right to travel is de minimis at best," in part because Surprenant "is free to travel on any of the alternative non-toll highways, roads, and bridges" available to those driving in, through, or around the City of Boston. *Id.* at 14. Surprenant dropped her Equal Protection claim. *Id.* at 1 n. 1. With respect to the dormant Commerce Clause claim and related damages claims, the Court gave the parties limited time "to develop the factual record under the test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)," and directed the parties to file supplemental memoranda addressing the *Pike* issues identified by the Court. Protective Order, Dkt # 71, at 1, 3.

**2. Creation of the Massachusetts Department of Transportation, and Transfer of Tunnel and Bridge Operations, Toll Collection, and Liabilities.**

After oral argument on the motions to dismiss, the Massachusetts Legislature consolidated previously separate transportation agencies and functions into a single state agency called the Massachusetts Department of Transportation, and transferred ownership and full responsibility for running the Sumner and Williams Tunnels and the Tobin Bridge to the Department. Mass. St. 2009, c. 25; First Amd. Compl., ¶¶ 2, 11. The Department

Case 1:15-cv-10132-FDS Document 70-2 Filed 03/06/15 Page 4 of 14

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

is now responsible for collecting tolls on these facilities, and for implementing the resident discount programs challenged by Surprenant. Mass. G.L. c. 6C, § 13(b); First Amd. Compl., ¶¶ 2, 11.

The Legislature transferred all liabilities associated with past operation of the tunnels and bridge from the MTA and Massport to the Department. *See* Mass. St. 2009, c. 25, § 133(b) & (c) ("all duly existing . . . obligations of the [MTA] . . . shall be deemed to be the obligations of the [Department];" this "transfer of . . . liabilities . . . shall be effective upon dissolution of the authority and shall bind all persons with or without notice and without any further action or documentation."); Mass. St. 2009, c. 120, § 42, amending Mass. St. 2009, c. 25, § 144 ("all duly existing . . . obligations of [Massport] regarding the bridge shall continue in effect and all rights and obligations thereunder shall transfer to the department on January 1, 2010 as the successor to the authority with respect thereto"). It also abolished the MTA. Mass. St. 2009, c. 25, § 75; First Amd. Compl., ¶ 2. Massport still exists, but it no longer owns or operates the Tobin Bridge, and no longer has any liability for past operation of the bridge. Mass. St. 2009, c. 120, § 42.

The timeline for these events was as follows: (i) the Department came into existence on July 1, 2009; (ii) the MTA was dissolved, and the Sumner and Williams bridges and associated liabilities were transferred to the Department, on November 1, 2009; and (iii) the Tobin Bridge and all associated liabilities were transferred from Massport to the Department on January 1, 2010. *See* Mass. St. 2009, c. 25, §§ 183-185.

**3. Amended Complaint and Sovereign Immunity and Eleventh Amendment Defenses.**

Surprenant filed an amended complaint to add the Department as a defendant on April 5, 2010. Surprenant conceded that the Legislature dissolved the MTA on or about November 1, 2009, and transferred all of "its functions, assets, and liabilities" to the Department. First Amd. Compl., ¶ 2. She also conceded that the Legislature mandated that the Tobin Bridge be transferred by Massport to the Department. *Id*. In its answer, the Department admitted these allegations regarding the MTA, and admitted that the Tobin Bridge was transferred by Massport to the Department on January 1, 2010. Answer, Dkt # 47, ¶ 2. The Department also put Surprenant on notice that, in light of these facts, her claims are barred by the Eleventh Amendment and the sovereign immunity of the Commonwealth of Massachusetts, and by the related fact that neither the Commonwealth nor the Department may be sued under 42 U.S.C. § 1983. *See id.*, First, Second, and Third Affirmative Defenses. Defendants reiterated these defenses in their responses to Surprenant's numerous discovery requests.

**Argument.**

**I. Under the Eleventh Amendment, the Court Lacks Power to Hear Most Claims Against an Agency of the Commonwealth of Massachusetts.**

The Eleventh Amendment to the United States Constitution is an "affirmation of state sovereign immunity as a limit on Article Ill's grant of federal jurisdiction." *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 98 (1984). It states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state." U.S. Const. Amend. XI. "The Supreme Court . . . has expanded the doctrine of sovereign immunity beyond the literal words of the Eleventh Amendment, holding that state governments, absent their consent, are not only immune from suit by citizens of another state, but by their own citizens as well." *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 529 n.23 (1st Cir. 2009) (citing *Alden v. Maine*, 527 U.S. 706, 728-29 (1999)). Thus, "[t]he Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *Pastrana-Torres v. Corporation de Puerto Rico Para La Difusión Pública*, 460 F.3d 124, 126 (1st Cir. 2006) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994)).

Case 1:15-cv-10132-FDS Document 70-2 Filed 03/06/15 Page 5 of 14

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

Eleventh Amendment immunity extends to State agencies that function as "arm[s] of the state government." *Coggeshall v. Massachusetts Bd. of Reg. of Psychologists*, 604 F.3d 658, 662 (1st Cir. 2010). "It has long been settled that the reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the University of California v. Doe*, 519 U.S. 425, 429 (1997). As shown below (at pages 5-15), the Department is an arm of the Commonwealth for purposes of the Eleventh Amendment.

That the Department has succeeded to functions of agencies such as the MTA and Massport that may not have been viewed as "arms of the state" for immunity purposes does not deprive the Department as successor entity of its Eleventh Amendment defense. *Maysonet-Robles*, 323 F. 3d at 48-52. (See pages 15-17, below.) Nor does the fact that the Department has been added as a defendant to a pre-existing civil action affect its rights in this regard. *Id*. at 50. The Department is not bound by its predecessors' status at the time of filing, and the Legislature's action in creating the Department as a successor to non-immunized agencies does not limit or waive the Commonwealth's Eleventh Amendment immunity. *Id*. at 49-50, 52-53.

Absent certain limited exceptions that are inapplicable here (see pages 17-20), "the Eleventh Amendment bars federal suits by citizens against the state or state agencies ... 'regardless of the nature of the relief sought.' " *O'Neill v. Baker*, 210 F.3d 41, 47 (1st. Cir. 2000) (quoting *Pennhurst*, 465 U.S. at 100). Any argument by Surprenant that she should be allowed to press claims for "prospective injunctive relief against the" Department would "therefore [be] unavailing." *Poirier v. Massachusetts Dept. of Correction*, 558 F.3d 92, 97 n.6 (1st Cir. 2009) (affirming dismissal of claims against Commonwealth agency for prospective injunctive relief). "A plaintiff may seek prospective injunctive relief against a state official" in federal court under *Ex parte Young*, 209 U.S. 123, 159 (1908), "but may not obtain such relief against a state or its agency because of the sovereign immunity bar of the Eleventh Amendment." *Poirier*, 558 F.3d at 97 n.6. Despite the fact that Surprenant was given notice of Defendants' Eleventh Amendment defense when the Department filed its answer in April 2010, however, Surprenant remains focused on her putative class action for damages, and does not seek injunctive relief from any state official.

**II. Now that Implementation of and All Liabilities Associated With the Resident Toll Discounts Have Been Transferred to the Department, surprenant's claims are barred by the commonwealth's sovereign Immunity and the Eleventh Amendment.**

**A. The Department Is an "Arm of the State" that Is Protected By the Eleventh Amendment.**

**1. The Supreme Court and First Circuit Criteria.**

For obvious reasons, disputes regarding the character of a state-created entity for Eleventh Amendment purposes often arise where, as here, the entity is formed as a public corporation to achieve some specific public objective. See *Pastrana-Torres*, 460 F. 3d at 126. For a considerable period, the First Circuit and most other federal courts of appeal concluded that "the salient factor in Eleventh Amendment determinations" was whether a Federal court judgment against the entity would have to be paid out of the state treasury. See *Hess*, 513 U.S. at 48-49. This approach was rejected by the Supreme Court, however. *Id*. at 39-40; *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

"[C]urrent Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system." *Hess*, 513 U.S. at 39. Any "claim that the Eleventh Amendment confers only protection from liability misunderstands the role of the Amendment in our system of federalism: 'The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the

Carol SUPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 6 of 14

instance of private parties.' " *Puerto Rico Aqueduct and Sewer Auth.*, 506 U.S. at 146 (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)). "The Amendment is rooted in recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity. . . .It thus accords the states the respect owed them as members of the federation." *Hess*, 513 U.S. at 39-40 (quoting *Puerto Rico Aqueduct and Sewer Auth.*, 506 U.S. at 146). Thus, "it is not just the state's interest in its public treasury which is at stake in the assertion of Eleventh Amendment immunity. The state also has a 'dignity' interest as a sovereign in not being hauled into federal court." *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico and the Caribbean Cardiovascular Ctr. Corp.*, 322 F. 3d 56, 63 (1st Cir. 2003), cert. denied, 540 U.S. 878 (2003) (citing *Federal Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 760 (2002) ("The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.")).

In 2003, in *Fresenius*, the First Circuit "reformulated its arm-of-the-state analysis for Eleventh Amendment immunity in response to intervening Supreme Court precedent," and in particular to conform to *Hess*. *Redondo Construction Corp., v. Puerto Rico Highway and Transportation Authority.*, 357 F. 3d 124, 126 (1st Cir. 2004). "*Hess* requires a two-step analysis." *Fresenius*, 322 F. 3d at 65. The first, and potentially dispositive, consideration is "whether the state has indicated an intention--either explicitly by statute or implicitly through the structure of the entity--that the entity share the state's sovereign immunity." *Redondo*, 357 F.3d at 126. The state's intentions regarding whether a given entity shall share in its sovereignty may be set forth expressly in the entity's governing statute, or may be established implicitly by means of the entity's structure, powers, limitations, and relationship to the state. *Id.* at 126-28. While the question whether a particular agency is an arm of the state for Eleventh Amendment purposes is one of federal law, "that federal question can be answered only after considering the provisions of state law that define the agency's character." *Id.* at 127 (quoting *Regents*, 519 U.S. at 429 n. 5). "The first prong of *Hess* pays considerable deference to the dignity interests of the state, focusing on both explicit and implicit indications that the state sought to cloak an entity in its Eleventh Amendment immunity." *Fresenius*, 322 F.3d at 67.

The second stage of analysis, which concerns "whether the state's treasury would be at risk in the event of an adverse judgment," has essentially been relegated to the position of a tiebreaker in the event that the first step (an analysis of the state's intentions based on explicit and implicit indications in the governing state law) fails to inform. See *Redondo*, 357 F. 3d at 126. If the first stage of analysis demonstrates that "the state has structured the entity to share its Eleventh Amendment immunity," then "Eleventh Amendment immunity applies" and there is no need to move to the second step and consider "the risk that money damages will be paid from the state's treasury if the entity is found liable." *Pastrana-Torres*, 460 F. 3d at 126.

**2. Application of the Criteria to the Department.**

In the present case, application of the first step of *Hess*, as refined by the Court of Appeals in *Fresenius, Redondo*, and *Pastrana-Torres*, demonstrates that the Department has been structured by the Legislature as an "arm of the state" entitled to share in the Commonwealth's Eleventh Amendment immunity.[1] The provisions of the Department's enabling act (Mass. G.L. c. 6C, as added by Mass. St. 2009, c. 25, § 8, and amended by Mass. St. 2009, c. 120) point conclusively to the Department's status as an arm of the state entitled to immunity from federal suit. The First Circuit has not delineated the distinction between an "explicit" statutory indicator and an "implicit" structural indicator. *Breneman v. United States*, 381 F.3d 33, 39 (1st Cir. 2004), refers to both prongs as demonstrating "structural factors." These cases generally discuss various relevant elements without characterizing them as "explicit" or "implicit." It is safe to say, however, that those provisions of the agency's enabling act that define how the agency is to be treated when it is involved in legal proceedings may be deemed to be explicit statutory indicators.

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 7 of 14

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

**a. Explicit Indicators: The Legislature Has Provided that the Department Shall Be Treated Like Other State Agencies When Sued and Share in the Commonwealth's Sovereign Immunity.**

The Legislature made explicit its intent that the Department be treated as an arm of the Commonwealth for Eleventh Amendment purposes, and that the Department will share the Commonwealth's sovereign immunity for all other purposes. First, the Legislature provided that "[t]he department . . . shall be generally considered to be an agency of the commonwealth for purposes of . . . (ii) any general or special law pertaining to judicial remedies or procedures; and (iii) court rules and standing orders." Mass. G.L. c. 6C, § 18, as amended by Mass. St. 2009, c. 120, § 5. In other words, the Department shall have protection with respect to proceedings commenced against it that is the same as that enjoyed by any other state agency.

Second, the Legislature amended the Massachusetts Tort Claims Act to make clear that the Department shares the Commonwealth's sovereign immunity under Massachusetts law, by including the Department along with the Commonwealth itself in the MTCA definition of "public employer." *See* Mass. St. 2009, c. 25, § 123 (adding the Department and the MTA to the definition of "public employer" in Mass. G.L. c. 258, § 1). [2] "General Laws c. 258 contains a limited waiver of sovereign immunity." *Anderson v. Gloucester*, 75 Mass. App. Ct. 429, 433, 914 N.E.2d 926, 929 (2009). The Commonwealth and Massachusetts governmental units or entities that fall within the statutory definition of "public employer" retain sovereign immunity with respect to claims identified in G.L. c. 258, § 10. *E.g., Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 284-285 (1985); *Fortenbacher v. Commonwealth*, 72 Mass. App. Ct. 82, 86-87, 888 N.E.2d 377, 381 (2008). Of particular relevance here, the Commonwealth and all other "public employers" are immune from claims based on any act or omission when "exercising due care in the execution of any statute." Mass. G.L. c. 258, § 10(a). Because the Department is included within the c. 258 definition of "public employer," on its face § 10(a) retains the sovereign immunity of the Commonwealth with respect to claims against the Department arising from implementation of the statutes mandating resident toll discounts for the Sumner and Williams Tunnels and Tobin Bridge.

Consistent with the above, the Legislature has also provided that the Department "shall not be considered to be encompassed by the words 'person' or 'whoever' in any general or special law unless a contrary intention clearly appears." Mass. G.L. c. 6C, § 18, as amended by Mass. St. 2009, c. 120, § 5. This further reflects the Legislature's intent that the Department will share in the Commonwealth's sovereign immunity, given that the exclusion of the Commonwealth from the scope of the term "person" is one manifestation of its sovereign immunity. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (neither states nor state officials acting in official capacities are "persons" for the purposes of 42 U.S.C. § 1983); *Commonwealth v. ELM Medical Laboratories, Inc.*, 33 Mass. App. Ct. 71, 76-80, 596 N.E.2d 376, 379-81 (1992) (because Commonwealth is not a "person," statute that authorizes civil actions against "persons" who violated someone's civil rights by "threats, intimidation or coercion," *see* Mass. G.L. c. 12, §§ 11H & 11I, did not waive Commonwealth's sovereign immunity).

It is of particular significance that Mass. G.L. c 6C, §18 (as amended by Mass. St. 2009, c. 120, § 5), provides that the Department shall be represented by the Attorney General, which is not true of independent authorities. *See* Mass. G.L. c. 12, § 3 ("The attorney general shall appear for the commonwealth and for state departments, officers and commissions in all suits and other civil proceedings...."). This is much more than a perfunctory gesture. In Massachusetts, the Attorney General "is the chief law officer of the Commonwealth, with the power to set a unified and consistent legal policy for the Commonwealth." *Commonwealth v. Twitchell*, 416 Mass. 114, 129, 617 N.E.2d 609, 619 (1993). She controls the conduct of litigation, and may make policy determinations that would ordinarily be made by the client agency. *See Alliance, AFSCME/SEIU v. Commonwealth*, 425 Mass. 534, 537-38 & n.6, 682 N.E.2d 607, 610 & n.6 (1997) (case was moot where Attorney General agreed with plaintiffs and declined to defend action, even where the Governor filed an amicus brief seeking to defend); *Feeney v. Commonwealth*, 373 Mass. 359, 365-68, 366 N.E.2d 1262, 1266-67 (1977) (Attorney General may prosecute appeal over express objections of state officers he represents, in both federal and state courts); *Secretary of Admin. and Finance v. Attorney*

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 8 of 14

*General,* 367 Mass. 154, 158-59, 326 N.E.2d 334, 336-37 (1975) (Attorney General may refuse to prosecute an appeal, despite request to the contrary by the Governor or other state official). Representation by the Attorney General means that, even though the Department can sue and be sued in its own name (*see* Mass. G.L. c. 6C, § 3(12)), the Department's litigation conduct is determined and managed by an elected state official who is wholly independent of the Department and serves as the Commonwealth's chief law officer--another clear indication that it is *not* viewed as operating outside of the state government structure.

**b. Implicit Indicators: The Department's Functions, Structure, and Relationship to the Commonwealth Confirm that It Is an Arm of the State.**

The Department's enabling act is also replete with organizational and other implicit, structural indicators that reflect the Legislature's intention that the Department share the Commonwealth's immunity from suit. At the outset, the Legislature repeatedly specified that the Department is a "state agency." The Department is included within the statutory definition of "state agencies" that are "involved in transportation related functions." Mass. G.L. c. 6C, § 1. The Department was "organized and shall function as a single state agency for administrative purposes, including but not limited to, for the purposes of the accounting and financial system of the commonwealth." Mass. G.L. c. 6C, §5(a). It "shall, for the purposes of compliance with state finance law, operate as a state agency ... and shall be subject to the provisions applicable to agencies under the control of the governor." Mass. G.L. c. 6C, § 15. The entity is called a "department," a term derived from Article 66 of the Amendments to the Massachusetts Constitution that required that all executive and administrative functions of the state government be organized in twenty "departments." While that amendment was repealed in favor of a new system of organization (see Article 87 of the Amendments), the concept of a "department" as a unit of the Commonwealth's executive branch survives.

Nomenclature is important in ascertaining what the Legislature intends an entity to be. Use of the term "a body politic and corporate," *see* Mass. G.L. c. 6C, § 2, indicates the creation of a "hybrid" entity, with "attributes of both private corporations and governmental agencies." *Kargman v Boston Water & Sewer Comm'n* 18 Mass. App. Ct. 51, 55, 463 N.E.2d 350, 353 (1984) superseded by statute on other grounds, *see Alex v Boston Water & Sewer Comm'n,* 45 Mass. App. Ct. 914 (1998)). Courts decide on a case by case basis whether a particular "body politic and corporate" is "more public than private." *Department of Community Affairs v. Massachusetts State College Building Auth.*, 378 Mass. 418, 425, 392 N.E.2d 1006, 1010 (1979). When the Legislature has created "independent financial and political corporate bodies performing special public functions," *Kargman,* 18 Mass. App. Ct. at 59, 463 N.E.2d at 355, it has generally labeled such bodies "authorities" to distinguish them from traditional departments or agencies. Examples include the Massachusetts Turnpike Authority and the Massachusetts Bay Transportation Authority. *Ibid.* By contrast, in Mass. G.L. c. 6C the Legislature eschews the term "authority" and instead refers to the newly created entity as a department or agency. [3]

A variety of statutory provisions confirm that the Legislature views the Department as an agency of the Commonwealth, rather than an independent enterprise. The Legislature has specified that the Department performs "essential governmental functions." See G.L. c. 6C, §§ 2(a), 27. As a result, the Department is "not required to pay any taxes or assessments," and its property is "exempt from taxation and from betterments and special assessments." Mass. G.L. c. 6C, § 27. The Department is subject to all normal state laws governing fiscal operations. Mass. G.L. c. 6C, §15 (in turn referencing Mass. G.L. c. 7 (Executive Office for Administration and Finance); Mass. G.L. c. 7A (State Comptroller); Mass. G.L. c. 10 (Treasurer and Receiver General); and Mass. G.L. c. 29 (general provisions governing state finance)). It participates in the Commonwealth's accounting and payroll systems. See Mass. G.L. c. 6C, § 5. In addition, the Department's employees are state employees for all purposes, including retirement, group insurance, and collective bargaining. E.g., Mass. St. 2009, c. 25, §§ 47, 64, 99-100, 137-143.

Carol SUPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 9 of 14

The Legislature structured the Department to succeed and incorporate former units of state government that exercised traditional governmental functions and that were unquestionably part of the executive branch. These include the former Executive Office of Transportation and Public Works (a cabinet-level agency), Massachusetts Highway Department (successor to the Massachusetts Department of Public Works), Registry of Motor Vehicles, and Massachusetts Aeronautics Commission. *Cf. Breneman,* 381 F. 3d at 39 (Massachusetts Aeronautics Commission was structured to share Commonwealth's sovereignty). Thus, the Legislature transferred to and included in the Department agencies that had enjoyed full Eleventh Amendment immunity, making it highly unlikely that it then intended to deprive such agencies of their preexisting immunity by placing them in an entity that would not be entitled to such protection.

By contrast, the transportation-related entities that the Legislature chose to keep independent have been placed outside the Department. These include the Massachusetts Bay Transportation Authority;[4] the Massachusetts Port Authority; the Woods Hole, Martha's Vineyard, and Nantucket Steamship Authority; and the regional transit authorities. *See* Mass. G.L. c. 6C, § 1 (definition of "independent agencies"). The MTA did not receive such treatment; it instead was abolished, with its functions transferred to the Department, see Mass. St. 2009, c. 25, §75, thereby indicating powerfully the Legislature's expectation that the functions in question would now be performed by a traditional, immunized agency. Likewise, while the Legislature transferred operations of the Tobin Bridge from Massport to the Department, see St. 2009, c. 25, §144, it did not incorporate that authority within the new structure. Instead, Massport survives as an independent entity. As agencies for which immunity is intended and appropriate are placed in the Department, and authorities that have not heretofore enjoyed Eleventh Amendment immunity remain outside it, the intention of the Legislature on the subject is clear.

The presence or absence of control of an entity by the state government has been accorded considerable significance in the Eleventh Amendment analysis. E.g., *Pastrana-Torres,* 460 F.3d at 126. Where entities are not arms of the state, their enabling acts "afford considerable political independence to the respective governing bodies." *Kargman,* 18 Mass. App. Ct. at 57, 463 N.E.2d at 354; *see also, e.g., Boston v. Massachusetts Bay Transp. Auth.*, 373 Mass. 819, 826, 370 N.E.2d 1359, 1363-64 (1977). Here, in contrast, the Department has been subjected to considerable state control of the kind associated with traditional state agencies.

The Department is structured to give the Governor the power to control the Department's policies and practices, and to ensure that the Department functions as an integral part of Massachusetts state government. While the Department is governed by a board of directors, the board is appointed by the Governor, who also designates which of the directors shall be chairman. Mass. G.L. c 6C, §2(b). The Governor may remove any director for cause. *Id*. The Department is led by a Secretary who is appointed by the Governor, serves at the pleasure of and may be removed by the Governor, and otherwise serves for a term coterminous with the Governor. Mass. G.L. c. 6C, § 2(e) & § 29(a). The Governor also has the power "to fix [the Secretary's] compensation and conditions of employment." *Id*. § 2(e). The Secretary is "the chief executive, administrative and operational officer of the department and shall direct and supervise the administrative affairs and the general management of the department." *Id*. The Secretary must obtain approval of the Governor before appointing anyone to serve as administrator of one of the Department's four principal units: the highway division, the mass transit division, the aeronautics division, and the registry of motor vehicles. *Id.* § 29(b) and (c).

Governmental control of the Department is exerted in other ways as well. The Department must file quarterly reports with the Governor and the Legislature regarding the progress of incorporation of the prior transportation agencies and operations into the new entity. Mass. St. 2009, c. 25, §149. It must submit an annual finance plan to the secretary of administration and finance, Mass. G.L. c. 6C §16, as well as an annual report to various legislative chairs detailing the fiscal year's revenues, expenditures, and debts, *id*. §28. Reporting requirements are an indicator of state control, see *Pastrana-Torres,* 460 F.3d at 127, and control is inconsistent with independence.

Case 1:15-cv-10132-FDS Document 70-2 Filed 03/06/15 Page 10 of 14

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

An additional significant indicator that the Legislature did not intend that the Department be independent of the Commonwealth is that its enabling act operates conservatively with respect to its ability to borrow money. The principal authorization in this regard is found in Mass. G. L. c. 6C, §17, which permits the Department to refinance existing bonds previously issued by the MTA. This authorization was required because the Legislature abolished the MTA and transferred its obligations to the Department. See Mass. St. 2009, c. 25, §133. The amounts owed bondholders have to be paid, thereby making the ability to refinance a practical necessity; it is not the equivalent of an authorization to incur new debt. Otherwise, there are only two other portions of the Department's enabling act that refer to borrowing authority. Mass. G. L. c. 6C, § 3, ¶¶ (15)-(17) authorize the issuance of notes or bonds, but only "as provided in this chapter." With a single exception, there are no additional provisions in the chapter governing borrowing by the Department, thereby rendering the authorization extremely narrow. The single exception is found at G. L. c. 6C, §67, which provides for the sale by the Department of bonds or notes in connection with so-called "design-build-finance-operate-maintain" projects, see G.L. c. 6C, §§ 62-73. Apart from this one limited authorization, the Department is dependent on the Commonwealth for the raising of new capital to fund any construction, renovation, acquisition, or other projects.

Nor does the Commonwealth require that the Department rely on revenues generated solely by its own operations to carry out its mission, as is characteristic of independent authorities. To the contrary, the Legislature appropriated $200,126,756 for expenditure by the Department in the Commonwealth's general operating budget for fiscal year 2011; the Governor reduced this amount to $195,126,756 in his veto message. *See* Mass. St. 2010, c. 131, §2E, item 1595--6368. This was carried out by transferring monies from a Commonwealth fund generated by gasoline, sales, and other taxes to the fund used by the Department for transportation-related purposes. *Id.*

Finally, but perhaps most important, the objectives of the Legislature must be taken into account; when that is done, there remains little doubt that the Department satisfies all of the first-step criteria that identify an arm of the state. In contrast to the single-purpose authorities that have been deemed not to be arms of the state, the Department is responsible for much of the Commonwealth's public transportation operations, including the most important roadways (Massachusetts Turnpike, Boston Turnpike Extension, Callahan, Sumner and Williams Tunnels, central artery, designated parkways, state highway system, metropolitan highway system), bridges, and public-use airports, as well as for influencing the development and operation of rail transit systems and managing the registration of motor vehicles and enforcement of automobile and truck laws. Mass. G.L. c. 6C, §§ 1, 3. It exercises overall responsibility for the development of transportation policy on behalf of the state government. *See* G.L. c. 6C, §§ 2, 10.

Applying all of the explicit and implicit criteria containing in the enabling act, it is clear that the Legislature has not engaged in an "effort at privatization" of the Commonwealth's transportation operations, see *Fresenius*, 322 F.3d at 64, but rather has collected these operations in an entity that is an agency of the Commonwealth and shares the Commonwealth's immunity.

**B. Surprenant Cannot Evade the Eleventh Amendment on the Ground that the MTA Previously Ran the Tunnels and Massport Previously Ran the Bridge.**

It does not matter whether the MTA or Massport could have invoked Eleventh Amendment immunity when they owned the tunnels and bridge and were liable for claims arising from the operation of those facilities. The Legislature has now transferred those facilities, all associated liabilities and other obligations, and future responsibility for implementing the local resident toll discount statutes to the Department. Mass. St. 2009, c. 25, § 133 (transfers Sumner and Williams Tunnel obligations from MTA to Department); Mass. St. 2009, c. 120, § 42, amending Mass. St. 2009, c. 25, § 144 (transfers Tobin Bridge obligations from Massport to Department, "as the successor to the authority with respect thereto"); Mass. G.L. c. 6C, § 13(b) (makes Department responsible

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 11 of 14

Carol SUPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

for implementing resident toll discount statutes); First Amd. Compl., ¶¶ 2, 11. Indeed, the MTA no longer exists. Mass. St. 2009, c. 25, § 75; First Amd. Comp. ¶ 2.

As a result of this reorganization, Surprenant's claims are barred by the Eleventh Amendment. *Maysonet-Robles*, 323 F.3d at 48-52 (Eleventh Amendment barred claims concerning obligations transferred, while lawsuit was pending, from Puerto Rico Urban Renewal and Housing Corporation to Department of Housing of the Commonwealth of Puerto Rico, even though former had no immunity); accord *Kroll v. Board of Trustees of the Univ. of Ill.*, 934 F.2d 904, 909 (7th Cir. 1991) (Eleventh Amendment barred claims concerning obligations transferred from athletic association to board of trustees, even assuming that former was a non-profit corporation with no immunity); *Williams Towing Co. v. Illinois*, 534 F.2d 758, 760-61 (7th Cir. 1976) (Eleventh Amendment barred claims concerning obligations transferred from Cairo Bridge Commission to State of Illinois, even assuming that former had no immunity).

"Unlike a private individual or corporation, a State retains its sovereign immunity as a 'personal privilege' and, whether it is the original defendant or is added as a party later, it cannot be sued involuntarily." *Maysonet-Robles*, 323 F.3d at 50. The Commonwealth's Eleventh Amendment immunity is not affected by the fact that the Department has been sued as successor in interest to the MTA and Massport. The Department "is an arm of the State, regardless of its late arrival at the courthouse as a successor in interest, and it must be accorded the same respect due a State under the Eleventh Amendment." *Id*.

The Legislature transferred the tunnels, bridge, and all associated obligations to the Department as part of a comprehensive scheme "to reorganize and restructure transportation agencies in the commonwealth to help address anticipated funding deficiencies." Mass. St. 2009, c. 25, preamble. But even if the Legislature had done so "with the precise goal of raising the shield of immunity," the Eleventh Amendment would still bar Surprenant from pressing her claims in federal court. *Maysonet-Robles*, 323 F.3d at 51.

Nor does it matter that, in transferring obligations from MTA and Massport to the Department, the Legislature provided that "[n]o existing right or remedy . . . shall be lost, impaired, or affected" as a result. Mass. St. 2009, c. 25, § 133(b) (re obligations transferred from MTA to Department); Mass. St. 2009, c. 120, § 42 (re obligations transferred from Massport). These provisions are not "unequivocal" waivers of Eleventh Amendment immunity, because they can be read as allowing for enforcement of obligations in Massachusetts courts, but not in federal courts. See *Maysonet-Robles*, 323 F.3d at 50-52. (The requirement that Eleventh Amendment waivers be unequivocal is discussed at pages 18-20, below.)

Because the MTA no longer exists, and all obligations associated with the tunnels and bridge have been transferred from the MTA and Massport to the Department as successor in interest, Surprenant may not obtain relief against either of those defendants. Thus, in addition to the bar of Eleventh Amendment immunity, Surprenant's claims against the MTA and Massport must be dismissed for the further reason that she alleges no facts that "plausibly suggest" that she is entitled to relief against either of them. See *Ashcroft v. Iqball*, 129 S.Ct. 1937, 1950-53 (2009).

### C. Neither Exception to Eleventh Amendment Immunity Applies.

There are "two general exceptions" to the Eleventh Amendment's limitation on federal court jurisdiction over State entities. *Maysonet-Robles*, 323 F.3d at 49. "First, Congress may abrogate a State's immunity by expressly authorizing such a suit pursuant to a valid exercise of power. Second, a State may waive its sovereign immunity by consenting to be sued in federal court." *Id*. (citing *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999)). Neither of these exceptions applies here.

Case 1:15-cv-10132-FDS Document 70-2 Filed 03/06/15 Page 12 of 14

Carol SUPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

**1. Congress Did Not Abrogate the Commonwealth's Immunity.**

Surprenant has not identified, and cannot point to, any statute in which Congress has unequivocally and unmistakably abrogated the Commonwealth's Eleventh Amendment immunity with respect to Surprenant's claims. Congress may only abrogate States' Eleventh Amendment immunity if it (1) "unequivocally expresse[s] its intent to abrogate that immunity" and (2) "act[s] pursuant to a valid grant of constitutional authority." *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73 (2000). With respect to the first point, "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 243 (1985). "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically." *Id.* at 246. With respect to the second point, Congress may only abrogate State's immunity from suit in federal court as guaranteed in the Eleventh Amendment when it acts to enforce the Fourteenth Amendment, in accord with § 5 of that later Amendment. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 59-73 (1996). Congress has no power under the Commerce Clause or any other provision of Article I of the Constitution to abrogate Eleventh Amendment immunity. *Id.; accord Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 636 (1999) ("Congress may not abrogate state sovereign immunity pursuant to its Article I powers.").

Though Surprenant asserts a claim under 42 U.S.C. § 1983 in her amended complaint, that does not allow her to circumvent the Eleventh Amendment. "The Supreme Court has specifically held," in *Quern v. Jordan,* 440 U.S. 332, 341 (1979), "that enactment of § 1983 did not abrogate the Eleventh Amendment immunity of the states." *Colon-Rivera v. Puerto Rico Dept. of Social Services,* 736 F.2d 804, 806 n.2 (1st Cir. 1984). Indeed, § 1983 did not create any cause of action against the States or against state officials acting in their official capacities. *Will,* 491 U.S. at 71 ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."). Nor has Congress enacted any other statute pursuant to its Fourteenth Amendment enforcement power that unequivocally abrogates States' Eleventh Amendment immunity with respect to dormant Commerce Clause claims or, for that matter, claims under the Privilege and Immunities Clause of the Fourteenth Amendment.

**2. The Commonwealth Did Not Waive Its Immunity.**

The "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one" as well. *Maysonet-Robles,* 323 F.3d at 50 (quoting *Atascadero,* 473 U.S. at 241). Such a waiver "must be unequivocal;" "the State must express itself in unmistakably clear language, allowing for no other reasonable construction, that it intends to submit itself to the jurisdiction of the federal courts." *Id.* at 50-51. Thus, "for a state statute to constitute a waiver of Eleventh Amendment immunity, 'it must specify the State's intention to subject itself to suit in *federal court.*'" *Ramos-Pinero v. Puerto Rico,* 453 F.3d 48, 51 n.5 (1st Cir. 2006) (quoting *Atascadero,* 473 U.S. at 241 (emphasis in original)). "Neither consent to be sued in state court nor a general waiver of sovereign immunity is sufficient." *Id.*

The fact that the Department "has the power 'to sue and be sued in its own name, plead and be impleaded,'" *see* Mass. G.L. c. 6C, § 3(12), does not "strip" the Department "of its Eleventh Amendment immunity." *In re San Juan DuPont Plaza Hotel Fire Litig.,* 888 F.2d 940, 44 (1st Cir. 1989). "[A] statutory provision allowing a state agency to be sued does not necessarily indicate that 'the legislature has waived the eleventh amendment and has consented to let the state be sued for money damages not only in a state but in a federal court. A waiver is found only where it is manifest that waiver of the eleventh amendment was intended.'" *Id.* at 944-45 (quoting *Culebras Enters. Corp. v. Rivera Rios,* 813 F.2d 506, 517 n. 9 (1st Cir. 1987)); accord *College Sav. Bank,* 527 U.S. at 676 (State does not waive Eleventh Amendment immunity and "consent to suit in federal court merely

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 13 of 14

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

by stating its intention to 'sue and be sued,' or even by authorizing suits *against it* 'in any *court of competent jurisdiction*' ") *(citations omitted).*

Similarly, and as shown above, the statutory provisions stating that "no existing right or remedy . . . shall be lost, impaired or affected" by the transfer of liabilities from the MTA and Massport to the Department, *see* Mass. St. 2009, c. 25, § 133, and Mass. St. 2009, c. 120, § 42, do not constitute unequivocal waivers of immunity from suit in federal court. *Maysonet-Robles*, 323 F.3d at 51-52.

Finally, the Department has not waived the Commonwealth's Eleventh Amendment "by invoking federal jurisdiction voluntarily through affirmative litigation conduct." *Id*. at 51. The Department did not come voluntarily to federal court, either by filing an action or removing one from state court. "[A]s with statutory waiver, the State's litigation conduct must be unambiguous" to constitute a waiver of Eleventh Amendment immunity. *Id*. at 52. "Thus, the State's actions must evince a clear choice to submit its rights for adjudication by the federal courts." *Id*. But it was Surprenant who filed suit in federal court. The Department immediately invoked the Eleventh Amendment in its answer. There has been no waiver.

**Conclusion.**

For the reasons stated above, all of Surprenant's claims are barred by the Eleventh Amendment to the United States Constitution. Pursuant to Fed. R. Civ. P. 12(c), Defendants are entitled to judgment on the pleadings dismissing all claims.

MARTHA COAKLEY

*Attorney General of Massachusetts*

*/s/ Kenneth W. Salinger*

Kenneth W. Salinger (BBO # 556967)

Assistant Attorney General

Government Bureau

Office of the Attorney General

One Ashburton Place

Boston, MA 02108

617.963.2075

ken.salinger@state.ma.us

William A. Zucker (BBO# 541240)

wzucker@mccarter.com

Gregory D. Cote (BBO# 645943)

Carol SURPRENANT, Individually and on Behalf of All..., 2010 WL 6208658...

Case 1:15-cv-10132-FDS   Document 70-2   Filed 03/06/15   Page 14 of 14

gcote@mccarter.com

McCarter & English, LLP

265 Franklin Street

Boston, MA 02110

(617) 449-6500

September 27, 2010

Footnotes

1  The Department submits that the second step of the *Hess/Fresenius/Redondo/Pastrana-Torres*, analysis (the effect on the state treasury) would also establish that it is entitled to Eleventh Amendment immunity. Because the Department should prevail under the first step (i.e., structure as immunized agency), it is unnecessary to consider the second issue at this time.

2  Although the Legislature originally added a second reference to the Department at the end of this definition of "public employer," that second reference was soon deleted. *See* Mass. St. 2009, c. 120, § 40, which amends Mass. St. 2009, c. 25, § 124.

3  An exception appears in Mass. G.L. c. 6C, §2(*b*), which provides that "[t]he authority" shall be governed by a board of directors, and in Mass. G.L. c. 6C, § 46A, which gives "the authority" power to make certain leases. Use of that term appears to have been inadvertent, given that the entity is otherwise referred to throughout Chapter 6C as "the department." The definitions section has no entry for "Authority," and defines "Department" to mean "the Massachusetts Department of Transportation established in section 2." *See* Mass. G.L. c. 6C, § 1.

4  While the Department has certain coordinating responsibilities that affect the Massachusetts Bay Transportation Authority, see G.L. c. 6C, §53, the Authority operates independently.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.