UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HYUNDAI ROTEM COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| BOMBARDIER TRANSIT CORPORATION, | ) |
| | ) |
| Intervenor- | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| MASSACHUSETTS BAY | ) |
| TRANSPORTATION AUTHORITY, ET AL., | ) |
| | ) |
| Defendants. | ) |
| | ) |

CIVIL ACTION
NO. 1:15-cv-10132

## REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS

Defendant Massachusetts Bay Transportation Authority ("MBTA") respectfully submits this brief in reply to the oppositions of plaintiffs Hyundai Rotem Company ("HRC") and Bombardier Transit Corporation ("Bombardier") to the MBTA's motion to dismiss.

### A. The MBTA's Status as a Body Politic and Corporate and Political Subdivision Does Not Dictate the Outcome of the Arm of the State Analysis.

Plaintiffs contend that the Court's analysis should begin and end with the fact that the MBTA is a political subdivision. HRC Br. at 4; Bombardier Br. at 11–13. The MBTA is not just a "political subdivision," however. It also is a "body politic and corporate." *See* G.L. c. 161A, § 2. When the Massachusetts legislature creates a "body politic and corporate," it creates a public corporation. *See Commonwealth v. Biagiotti*, 451 Mass. 599, 601 (2008). Such "special-purpose public corporations established by a state sometimes share the state's Eleventh Amendment immunity." *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1st Cir. 2003). The MBTA's designation as a body politic and corporate therefore is the beginning, not the end, of the multi-

factor arm of the State analysis required by *Fresenius*.

Even if the MBTA had been created as a pure political subdivision, *Fresenius's* arm of the State analysis still would apply. "A political subdivision of a state . . . is presumed a citizen of the state for federal diversity jurisdiction purposes **unless it operates as 'the arm or alter ego of the State**.'" *Single Source, Inc. v. Cent. Reg'l Tourism Dist., Inc.*, 2011 WL 1877700, at *4 (D. Mass. 2011) (citing *Moor v. Cnty. of Alameda*, 411 U.S. 693, 717 (1973)) (emphasis added). *See also Fresenius*, 322 F.3d at 61 (stating that the "arm-of-the-state doctrine arises in connection with at least three types of entities [political subdivisions, interstate compacts, and special purpose corporations], and that the "arm of the state analytical doctrine has moved freely amongst these three categories, applying common principles.").

The Supreme Court applied similar reasoning just this past week, holding that legislative labels are not dispositive of the status of a governmental entity for constitutional purposes. *Dep't of Transp. v. Ass'n of American Railroads*, 575 U.S. __, No 13-1080, slip op. (March 9, 2015). The issue in *American Railroads* was whether Amtrak was a private entity to which Congress could not constitutionally delegate governmental powers. The plaintiff claimed that Congress's declaration that Amtrak "is not a department, agency, or instrumentality of the United States Government" precluded a finding that Amtrak was a government entity. *Id.* at 10 (quoting 49 U.S.C. §§ 2430(a)(2)–(3)). The Supreme Court rejected that argument, holding that legislative pronouncements are not dispositive of an entity's status and that, instead, an "independent inquiry" into the entity's status is required. *Id.* at 7. Accordingly, the Court analyzed factors such as Amtrak's "ownership and corporate structure," *id.*, the extent to which the political branches "exercise[d] substantial, statutorily mandated supervision" over Amtrak's "priorities and operations," *id.* at 8, and Amtrak's dependence on federal financial support, *id.* at 9. In light of Amtrak's "unique features and its significant ties to the Government," the Court held that Amtrak was a governmental entity, not an "autonomous" private enterprise. *Id.* at 9–10. *See generally Lebron v. Nat'l R.R. Passenger Co.*, 513 U.S. 374, 392 (1995) (legislative charter's disclaimer of governmental status did not control whether corporation was governmental entity

A/76746213.3

for constitutional purposes) (cited in *American Railroads*, *supra*, slip op. at 10–11); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (analyzing characteristics of a school district, a "political subdivision" under a state statute, to determine whether it was an "arm of the state").

The First Circuit's decision in *Fresenius*, like the Supreme Court's decision in *American Railroads*, does not make the Court a slave to labels.  Applying the objective inquiry required by *Fresenius* compels the conclusion that the MBTA is an arm of the State.  *See generally Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1303 (11th Cir. 2005) (whether an entity is an arm of the state "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise.") (citation and quotations omitted).

 **B.** **The Operational Structure of the MBTA Was Fundamentally Changed by the Transportation Reform Act and Subsequent Amendments.**

Plaintiffs repeatedly, and mistakenly, claim that the 2009 Transportation Reform Act (the "Act"), G.L. c. 6C (and the subsequent amendments thereto) effected no substantive change over the control and operations of the MBTA.[1]  The plain meaning of the Act—studiously avoided by plaintiffs—demonstrates otherwise.

A 2012 amendment to the Act amended § 7 of G.L. c. 161A (the MBTA's enabling act) to provide:

> The authority shall be governed and its corporate powers exercised by the board of directors of the Massachusetts Department of Transportation established under chapter 6C.

St. 2012 c. 242, § 9 (amending G.L. c. 161A, § 7).

This was no modest legislative change to the MBTA's structure and operations.  For the first time in its history, the MBTA was "governed" not by its own board of directors, but by the

---

[1] Attached as Exhibit A is a chart showing changes made to the MBTA's enabling statute under the Act.

board of a State agency authorized to exercise the MBTA's "corporate powers."  That State agency, as plaintiffs concede, is a sovereign entity immune from suit under the Eleventh Amendment.  *See Surprenant v. Mass. Tpk. Auth.*, 768 F. Supp. 2d 312, 319 (D. Mass. 2011).  Remarkably, § 7, the legislative provision that accomplished this result, is not cited anywhere in HRC's brief.  Bombardier quotes it just once, but does not dare to address its plain meaning.  *See* Bombardier Br. at 17.

Because of the extent to which § 7 interacts with other provisions of c. 161A, the effect of the 2012 amendment was far-reaching.  For example, § 1 of c. 161A provides that the term "Board" means the "board of directors of the authority established by section 7," *i.e.*, the DOT Board.  *See* G.L. c. 161A, § 1.  Consequently, the 19 powers of the MBTA listed in § 3 of G.L. c. 161A—"in each case to be exercised **by the board** unless otherwise specifically provided—are the enumerated powers of the DOT Board.  *Id.* § 3 (emphasis added).  Among the powers "to be exercised by" the DOT Board are:

- The power to "hold, operate and manage the mass transportation facilities and equipment acquired by the authority."  G.L. c. 161A, § 3(c).

- The power to "appoint and employ officers, including a general manager, agents, and employees to serve at the pleasure of the directors, except as may otherwise be provided in collective bargaining agreements, and to fix their compensation and conditions of employment . . ." *Id.* § 3(d).

- The power to "make, and from time to time revise and repeal, by-laws, rules, regulations and resolutions."  *Id.* § 3 (e).

- The power to "enter into agreements with other parties, including, without limiting the generality of the foregoing, government agencies, municipalities, authorities, private transportation companies, railroads, and other concerns, providing (i) for construction, operation and use of any mass transportation facility and equipment held or later acquired by the authority . . ." *Id.* § 3(f).

- The power to "establish transit facilities and related infrastructure, including

A/76746213.3

terminals, stations, access roads, and parking, pedestrian access facilities and bicycle parking and access facilities as may be deemed necessary and desirable." *Id.* § 3(g).

- The power to "provide for construction, extension, modification or improvement of the mass transportation facilities in the territory of the authority . . ." *Id.* § 3(k).

- The power to "buy, sell, lease, pledge and otherwise deal with real and personal property, as may be necessary for or incident to carrying out the foregoing powers and the accomplishment of the purposes of this chapter." *Id.* § 3(q).

- The power to "enter into contracts or agreements with the department or with any agency, authority or political subdivision of the commonwealth for the provision, at cost, of specified services either by the authority or by the department or such agency, authority, or political subdivision of the commonwealth." *Id.* § 3(r).

Plaintiffs presumably have a particular interest in still another power granted to the DOT Board under c. 161A.  Section 38 provides that the DOT Board "shall have charge of and supervise the investigation, settlement and defense of all [negligence] claims **and of all other suits or actions relating to the property or arising out of the construction, maintenance or operation of the authority**," *i.e.*, of suits such as this one.  G.L. c. 161A, § 38 (emphasis added).[2]

Rather than face up to the unambiguous statutory language quoted above, plaintiffs simply assert that nothing has changed from the days before the powers of the MBTA were exercised by the board of a sovereign state agency that possesses Eleventh Amendment immunity.  *See* HRC Br. at 13–14; Bombardier Br. at 17–18.  Indeed, Bombardier claims that the only change brought about by the Act was to permit the DOT Board to issue identification cards to MBTA Police Officers.  Bombardier Br. at 1, 14–16.  All else remains the same, according to Bombardier, because, as before, the MBTA still is controlled by a seven-person board whose

---

[2] Additional powers are enumerated in §§ 4, 12, 13 and 41 of c. 161A.

members are appointed by the Governor.  *See id.* at 17 ("Replacing each reference to 'DOT Board' with 'MBTA Board' perfectly describes the approval process involving the MBTA Board prior to the Reform Act.").

This is an extraordinary argument (even were it not made by a party who touts its ability to "recognize the distinction between changes in form versus substance," *id.* at 10).  The critical issue for Eleventh Amendment and citizenship purposes is not whether the MBTA still is governed by a seven-member board, but rather, whether the governing board is an instrumentality of the State or an instrumentality of local government.  As to that issue, plaintiffs do not dispute that the DOT and its board members are sovereigns who enjoy Eleventh Amendment immunity.  *See Surprenant*, 768 F. Supp. 2d at 319.  *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.").  These were changes of substance, not of form.[3]

### C.     The Complaints Seek to Reach State Funds.

Plaintiffs do not dispute that the contract at issue is entirely funded by the Commonwealth.  *See* St. 2014 c. 79, §2C (copy attached to Affidavit of Emma D. Hall, Ex. B) (appropriating $2.5 billion "for a program of transportation development and improvements," including for the "purpose of implementing rail improvements pursuant to chapter 161A of the General Laws [*i.e.*, the MBTA's enabling act].").  Nor do they dispute that, by statute, the funds used for vehicle procurement "shall include red line, orange line, green line and system-wide bus

---

[3] Under Bombardier's reasoning, there was no material change after President Truman seized the nation's steel mills in 1952 because, after all, the President's Executive Order expressly provided that, except as the Secretary of Commerce might order, "the managements of the plants, facilities, and other properties possession of which is taken pursuant to this order shall continue their functions," and the "rights and obligations of such companies shall remain in full force and effect," including "payments of dividends on stock," and "expenditures . . . made for other ordinary corporate or business purposes."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579, 592 (1952).  In both situations, a sovereign power was granted the authority to govern and exercise the corporate powers of an entity.

A/76746213.3

service." *Id.*

Plaintiffs also admit that the DOT was authorized to enter into contracts with and to advance monies to governmental entities covered by the funding act, "without prior expenditure by the agencies or authorities." *Id.* § 21. They further concede that the MBTA and the DOT entered into an Intergovernmental Service Agreement with the MBTA (the "ISA") to fund the purchase of the vehicles and the associated support costs. *See* Affidavit of Jonathan Davis, Ex. F at 10. HRC does not dispute that the relief it seeks—an order requiring the MBTA to award the contract to HRC—would increase the contract price paid by the Commonwealth by approximately $150 million. *See* Affidavit of Larry Varn, Ex. L at 7. For its part, Bombardier admits that a judgment in its favor requiring the contract to be re-bid might require the federal court to void the ISA, even though one of the contracting parties (the DOT) no longer is before the Court. *See* Bombardier Br. at 23.

Despite these concessions, plaintiffs maintain that this case has nothing to do with the public fisc of the Commonwealth. They claim that all that is at issue are "voluntary" payments made by the Commonwealth to the MBTA. The payment of funds pursuant to a legislative directive, however, hardly can be called "voluntary."

Plaintiffs also claim that since the money already has been appropriated, no new legislative appropriation is required. The relevant inquiry, however, is not whether a judgment will require a new appropriation but, rather, "whether the state has legally or practically obligated itself to pay the entity's indebtedness." *Fresenius*, 322 F.3d at 68. *See Pennhurst*, 465 U.S. at 101 n.11 ("The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'") (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963)).

### D.     Plaintiffs' Targeting of State Actors Requires Dismissal under the Eleventh Amendment.

As shown above, and for the reasons set forth in the MBTA's opening brief, regardless of

the MBTA's status before the passage of the 2009 Transportation Reform Act and the amendments thereto, the current legislative scheme makes the MBTA an arm of the State for diversity purposes and destroys diversity jurisdiction.[4]  Even assuming that the MBTA is not an arm of the State, however, because plaintiffs' claims challenge the conduct of State officials who unquestionably are entitled to Eleventh Amendment immunity, dismissal is warranted.

The Supreme Court encountered a similar situation in *Pennhurst*, a leading Eleventh Amendment case.  465 U.S. 89 (1984).  The plaintiffs in *Pennhurst* sued State departments and officials who ran a State hospital, as well as various *county* officials, over conditions at the hospital.  *Id.* at 92.  The Supreme Court held that the Eleventh Amendment barred a federal court from granting injunctive relief against the State officials on State law claims.  *Id.* at 106.  The Court then went further, holding that injunctive relief against the defendant county officials also could not be sustained.  "Even assuming that these [county] officials are not immune from suit," the Court ruled, "it is clear that without the injunction against the state institutions and officials in this case, an order on state-law grounds necessarily would be limited."  *Id.* at 123–24.  *See also id.* at 123 n.34 ("Given that the actions of the county commissioners and mental-health administrators are dependent on funding from the State, it may be that relief granted against these county officials, when exercising their functions under [State law] effectively runs against the State.").  The Court noted that the relief substantially concerned a State hospital operated by State officials and that "funding for the . . . programs comes almost entirely from the State."  *Id.* at 124.  Any relief granted against the county officials on the basis of the state statute, the Court held, "would be partial and incomplete at best."  *Id.*  *See also id.* ("Such an ineffective enforcement of state law would not appear to serve the purposes of efficiency, convenience, and fairness that must inform the exercise of pendent jurisdiction.").

---

[4] At certain points of its brief, HRC states that unless application of the first part of the *Fresenius* test shows that the State "clearly structured the entity to share its sovereignty," then "the inquiry is over."  HRC Br. at 3, 4, 15–16.  As HRC later seems to acknowledge, however, if the application of the multi-factor part of the Fresenius test is inconclusive, courts should proceed to the second, "tie-breaker," part of the test.  *Id.* at 16.

A/76746213.3

In this case, plaintiffs explicitly challenge the alleged conduct of the Governor, the Secretary of Transportation and the DOT Board in an attempt to nullify a contract award that, as required by State law, was approved by the DOT Board and is entirely funded by the Commonwealth.  According to HRC, "improper communications with [Governor] Patrick and [Secretary] Davey . . . tainted the integrity of the entire procurement process."  Hyundai First Amended Complaint ("H.A.C") ¶ 28.  *See also id.* at ¶ 2 (the MBTA was "influenced by improper communications" between CNR's Chinese partners and Governor Patrick and Secretary Davey); *id.* at ¶ 85 ("our former Governor, his Secretary of Transportation, MassDOT, and the MBTA took the political bait").  Bombardier similarly alleges that the MBTA was "influenced by improper communications" between Governor Patrick and Secretary Davey and CNR's Chinese partners.  Bombardier Amended Complaint ("B.A.C") ¶ 2.  *See also* Bombardier's Administrative Appeal of the CPO's Bid Protest Determination,  Hall Aff., Ex. H at 3 (the Governor and Secretary's communications were contrary to "[c]onscientiousness and good faith"); *id.* at 8 ("Clear inference of impropriety - trade mission and political benefits to Patrick & Davey"); *id*. (Governor and Secretary "certainly were not shy about taking credit and receiving the accompanying political benefit"); *id.* at 9 ("Messrs. Patrick and Davey improperly influenced the public procurement process").  Under these circumstances, relief granted solely against the MBTA "would be partial and incomplete at best."  *Pennhurst*, 465 U.S. at 124.

The conduct of the plaintiffs also reflects the central role played by State actors in the case.  In October 2014, for example, when HRC and Bombardier sought to postpone the contract award, they appeared before the DOT Board to make their request.  *See* October 22, 2014 DOT Board Minutes at 2, 6–8 (Davis Aff., Ex. D).  *See also* October 22, 2014 Board Meeting Speakers List, attached hereto as Exhibit B.  That they sought relief before the DOT Board was no accident.  As plaintiffs knew well, approval of the DOT Board was a statutory prerequisite to the MBTA's entering into the CNR contract.  *See* G.L. c. 161A,  §§ 3, 3(f) (the MBTA's  power "to enter into agreements with other parties, including . . . for the . . . use of any mass transportation facility and equipment held or later acquired by the authority," must "in each case

- 9 -

. . . be exercised by the [DOT] board . . .").

Similarly, when plaintiffs first filed this action, they named as defendants former DOT Secretary Davey and the remaining members of the DOT Board (as well as former Governor Patrick and the Executive Office of the Governor). Plaintiffs' subsequent decision to dismiss those defendants in an effort to preserve their jurisdictional arguments has by no means excised the DOT or the DOT Board from their claims. Plaintiffs still allege, and claim to be able to prove, that the Secretary of Transportation and the Governor had improper communications with the Chinese government that rendered the DOT Board's approval of the contract award to CNR unlawful under Massachusetts law. H.A.C. ¶¶ 24, 25, 28; B.A.C. ¶¶ 2, 73. Bombardier acknowledges that the relief it seeks may require the Court to void the ISA entered into by the DOT Board which, although a non-party, has charge of the MBTA's defense under c. 161A, § 38.; Bombardier Br. at 23. If, as the Supreme Court has stated, the "preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities," then the Eleventh Amendment surely is implicated by the plaintiff's claims that a contract award approved by a sovereign State entity was the product of improper conduct by high-ranking State officials in violation of State law. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).[5]

---

[5] Plaintiffs make much of the fact that, under G.L. c. 6, § 18, the Attorney General is not required to represent the MBTA. Section 18 states, in relevant part, that the "office of the attorney general shall appear for the [DOT], its divisions, departments, agencies and officers, *but not including* the Massachusetts Bay Transportation Authority . . ." *Id.* (emphasis added). This statutory language indicates that the legislature believes the MBTA is one of the "divisions, departments, [or] agencies" of the DOT, or else there would be no need to exclude the MBTA from the scope of the statute. Being represented by the Attorney General, in any event, has not been deemed a prerequisite to a finding of Eleventh Amendment immunity. *See Adams v. Cousins*, No. 06–40117–FDS, 2009 WL 1873584, at *6 (D. Mass. 2009); (Sheriff's Department represented by private counsel and entitled to Eleventh Amendment immunity); *Christoforo v. Lupo*, No. 03–12307–RGS, 2005 WL 3037076, at *3 n. 3 (D. Mass. 2005) (same); *Kelley v. DiPaola*, 379 F. Supp. 2d 96, 100 (D. Mass. 2005) (Sheriff's Department represented by Middlesex Sheriff's Office).

A/76746213.3

### E.      Plaintiffs Misunderstand the Case Law on which They Rely.

Plaintiffs' briefs reflect a fundamental misunderstanding of several cases on which they rely.

For example, plaintiffs accuse the MBTA of a "lack of candor" in citing *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998) as engaging in an Eleventh Amendment analysis.  HRC Br. at 3 n.4; *see* Bombardier Br. 5–6 n.1.  This accusation blithely ignores the section of the First Circuit's opinion entitled "Conforming Conduct to State Law."  *O'Brien*, 162 F.3d at 44.  It also ignores that the plaintiffs in *O'Brien* argued, as an alternative theory of injunctive relief, that the Massachusetts Constitution forbid the MBTA from accepting federal transportation funds conditioned upon requirements that the MBTA violate Massachusetts law on drug-testing.  *Id.*  And it ignores that when the First Circuit refused to "supervise state officials' compliance with state law," it did so by quoting the Supreme Court's decision in *Pennhurst*, an Eleventh Amendment case.  *Id.*

Plaintiffs place great reliance on statements made in a brief filed by the Attorney General in the *Surprenant* case, a case to which the MBTA was not a party.  In addition to the points made about *Surprenant* at footnote 13 of the MBTA's opening brief, it is significant that the Attorney General's brief in that case was filed in 2011, one year before the statutory amendment granting the DOT Board the power to govern and exercise the corporate powers of the MBTA.  *See* St. 2012 c. 242, § 9 (amending G.L. c. 161A, § 7).

Plaintiffs also erroneously maintain that the fact that the MBTA previously has been sued in federal court bears on this Court's Eleventh Amendment analysis.  A governmental entity's failure to assert the Eleventh Amendment in one proceeding does not waive its right to assert it in other proceedings (or, for that matter, to assert it on appeal after not raising it below).  *See Pennhurst*, 465 U.S. at 99 & n.8 ("the State's consent [must] be unequivocally expressed" and an Eleventh Amendment objection "may be raised at any point in a proceeding"); *see also R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 49 (1st Cir. 2002) (no waiver where State "invoked the aid of the federal courts in an entirely new and different proceeding than the one in

which it sought immunity").[6]

Finally, both plaintiffs rely on the 1983 decision of the district court for the District of Idaho in *Morrison-Knudsen Co. Inc. v. Mass. Bay Transp. Auth.*, 573 F. Supp. 698 (D. Idaho 1983), a case addressed in footnote 12 of the MBTA's opening brief. Plaintiffs' suggestion that the statutory framework governing the MBTA has not substantially changed in the 32 years since *Morrison-Knudsen* was decided is belied by the text of the 2009 Transportation Reform Act and the amendments thereto, including the 2012 amendment that gave the DOT Board the power to govern and exercise the corporate powers of the MBTA. Attached as Exhibit E hereto is a chart

---

[6] In all events, the MBTA cases cited by plaintiffs are readily distinguishable. *All* of the cases were filed before the 2012 legislative amendment authorizing the DOT Board to govern and exercise the corporate powers of the MBTA. In addition, of the three decisions cited by HRC as examples of federal cases against the MBTA "not dismissed for lack of subject matter jurisdiction," HRC Br. at 10 n.10, (1) *CSX Transp., Inc. v. Mass. Bay Transp. Auth.*, 2011 WL 3207770, No. 06–40211–FDS (D. Mass. July 27, 2011) involved the denial of a motion to abstain and did not address the Eleventh Amendment; (2) *Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36 (1st Cir. 2013) did not address the Eleventh Amendment and involved a federal Title VII employment discrimination claim outside the scope of the Eleventh Amendment; and (3) *Boston & Maine Corp. v. Mass. Bay Transp. Auth.*, 587 F.3d 89 (1st Cir. 2009) involved the enforcement of a bankruptcy discharge and did not discuss any Eleventh Amendment issues.

The cases cited at page 8 of Bombardier's brief are no more persuasive. *Mass. Bay Transp. Auth. v. Rocla Concrete Tie, Inc.*, No. 1:10-cv-10917-DPW (D. Mass. 2011), was resolved by a stipulation of dismissal filed in 2011, before the DOT Board replaced the MBTA Board. *Lawson-Velez v. Mass. Bay Transp. Auth.*, No. 1:11-cv-11652-RBC (D. Mass. 2013) did not discuss the Eleventh Amendment and involved federal employment discrimination claims. In *Geshke v. Crocs v. Mass. Bay Transp. Auth.*, No. 10-11567-RGS (D. Mass. 2010), cited by Bombardier at page 19 of its Brief, the MBTA argued that a dismissal on Eleventh Amendment grounds was warranted simply because the 2009 Transportation Reform Act designated the MBTA as a public employer entitled to protection under the Massachusetts Tort Claims Act. (A copy of the MBTA's Memorandum of Law in Support of Its Motion to Dismiss in *Geshke* is attached hereto as Exhibit C). Judge Stearns denied the motion, ruling that "[w]ithout more, the court cannot undertake the analysis" required by the First Circuit in *Fresenius*. (A copy of Judge Stearns' ruling is attached hereto as Exhibit D). Given the very different record presented here—and the fact that *Geshke* was decided before the DOT Board replaced the MBTA Board, the decision is irrelevant to the issue before this Court. *Gallo v. Essex Cnty. Sheriff's Dept.*, 2011 WL 1155385 (D. Mass 2011), also cited by Bombardier, is another case in which the MBTA was not a party and predated the DOT Board's statutory replacement of the MBTA Board.

that illustrates numerous substantive changes to c. 161A adopted by the legislature since 1983. The relevance of the *Morrison-Knudsen* decision to this case is tenuous, at best. [7]

### F.    The Court Should Abstain from Exercising Federal Jurisdiction.

Plaintiffs' assertions that the MBTA's functions are local and proprietary in nature, *see, e.g.*, Bombardier Br. at 14–15, cannot be squared with numerous legislative pronouncements. The MBTA provides subway, bus, ferry, and commuter rail services to 65 cities and towns, as well as an additional 110 "other served communities." G.L. c. 161A, § 1.   It is authorized to "operate mass transportation facilities and equipment, directly or under contract in areas outside the area constituting the authority," subject to certain restrictions.   *Id.* §3(j).   By statute, the MBTA's "program for mass transportation" must be "a comprehensive, coordinated program of construction, reconstruction, and development of mass transportation facilities and equipment throughout the area constituting the authority *for the benefit of the inhabitants thereof and the commonwealth. . .*"   *Id.* §1 (emphasis added).   *See also* G.L. c.161, §5(g) (MBTA's program and

---

[7] Bombardier mistakenly states that the MBTA "claims that being defined as a 'public employer' under the Massachusetts Tort Claims Act equates to a grant of sovereign immunity." Bombardier Br. at 19.  The MBTA made no such argument.  What the MBTA did (and does) argue is that the legislature's decision in 2009 to include the MBTA within the protections of the Massachusetts Tort Claims Act is one relevant factor in the Eleventh Amendment analysis.  *See* MBTA's Br. at 12–13; *see also Single Source*, 2011 WL 1877700, at *5 & n.9 (*Fresenius* factors include whether the entity "may sue and be sued in its own name").

Both plaintiffs misunderstand the effect of the legislature bringing the MBTA within the protections of the Massachusetts Tort Claims Act.   *See* HRC Br. at 7–8; Bombardier Br. at 19–20.   Prior to the 2009 Transportation Reform Act, the Commonwealth had waived sovereign immunity as to the MBTA, consenting to suit in G.L. c. 161A, § 21, inserted by St. 1964 c. 563, § 18.  While this statutory consent to suit was in effect, the MBTA was "subject to tort liability." *Lavecchia v. Mass. Bay Transp. Auth.*, 441 Mass. 240, 243–244 (2004). "Inclusion of a liability provision in the MBTA enabling statute was significant because, without such a provision the MBTA, as a State entity, would have been immune from tort actions under the then prevailing law of sovereign immunity."  *Id.* at 244.  "Effective November 1, 2009, however, the Legislature annulled the waiver of immunity in G.L. c. 161A, § 38.  See St. 2009 c. 25, §§ 112–113."  *Smith v. Mass. Bay Transp. Auth.*, 462 Mass. 370, 373 (2012).  As a result of the Act, the MBTA, like all "public employers" under the Act, gained the protections of sovereign immunity granted by the Tort Claims Act.  *Id.* ("The protections accorded public employers under the Tort Claims Act reflect the common-law doctrine of sovereign immunity.").

A/76746213.3

plan for mass transportation must be based on, among other things "an evaluation of the impact of each proposed capital investment on the effectiveness of the commonwealth's transportation system"). When authorizing the appropriations that fund this very procurement, the Legislature required that final assembly take place "in the commonwealth," and required that the MBTA consider "the effect said proposals will have on job creation and retention in the commonwealth and how said proposals will foster economic development in the commonwealth." St. 2014 c. 79, § 2C. As in *United States ex rel. Lesinkski v. So. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 603 (11th Cir. 2014), the MBTA "perform[s] a state function . . . with regional flexibility and discretion," further reason to abstain. *See id.* (finding a Florida water district to be an arm of the state).

Plaintiff's other arguments against abstention are most notable for what they do not say. HRC asserts that the procurement is governed by G.L. c. 30, § 39M (an essential element of its claim that the Court should award the contract to HRC as the true lowest bidder). But it cites no case law countering the cases cited by the MBTA establishing that the statute only applies to contracts involving the construction of public buildings and improvements on land owned by the Commonwealth and for materials that typically go into such construction projects. MBTA Br. at 19 n.14. Nor does HRC cite any case law countering the MBTA's claim that no Massachusetts appellate case has granted injunctive relief without proof of the violation of a bidding statute such as § 39M. For its part, Bombardier avoids addressing how its request that the award be re-bid (rather than the contract being awarded to HRC) is viable under State law if, as HRC claims, § 39M applies. Under these circumstances, plaintiffs' description of the case as involving straightforward issues of State law rings hollow.

Neither HRC nor Bombardier, moreover, attempts to explain how this Court can rule on their claims that the Governor of the Commonwealth and the Secretary of the Department of Transportation violated State law by engaging in improper communications with the Chinese government that allegedly tainted the procurement process without, by necessity, addressing important and undecided issues of State law. Nor do they even attempt to address how a federal

court readily could balance the competing public interests involved in requests to undo a procurement intended to modernize Orange and Red Line vehicles on a public transit system attempting to recover from the effects of this winter's blizzards and the effect it has had on the Commonwealth's economy.  Given the number of novel State law issues involving matters of significant public interest presented in this case, and in order to protect the "dignity that is consistent with [the Commonwealth's] status as [a] sovereign entit[y]," abstention would be well within the Court's discretion.  *Fed. Mar. Comm'n*, 535 U.S. at 760.

## CONCLUSION

For the foregoing reasons, plaintiffs' complaints should be dismissed or, alternatively, the Court should abstain from exercising federal jurisdiction over the State law issues raised by the plaintiffs' complaints.

Respectfully submitted,

**MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY**

By its attorneys,

/s/ Emma D. Hall
Jonathan M. Albano, BBO #013850
jonathan.albano@morganlewis.com
Thane D. Scott, BBO #449340
thane.scott@morganlewis.com
Neil G. McGaraghan, BBO #649704
neil.mcgaraghan@morganlewis.com
Emma D. Hall, BBO #687947
emma.hall@morganlewis.com
**MORGAN, LEWIS & BOCKIUS, LLP**
One Federal Street
Boston, MA  02110-1726
Phone: 617-951-8000
Fax:    617-951-8736

Dated:  March 12, 2015

**CERTIFICATE OF SERVICE**

I, Emma D. Hall, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 12, 2015.

/s/ Emma D. Hall

A/76746213.3